ALBERT & J. M. ANDERSON MANUFACTURING COMPANY, PETITIONER, *v.* SECRETARY OF WAR, RESPONDENT.

Docket No. 105–R.   Promulgated January 31, 1949.

*Allen H. Gardner, Esq.*, and *David Fegan, Esq.*, for the petitioner.
*Harland F. Leathers, Esq.*, and *Frederick N. Curley, Esq.*, for the respondent.

## OPINION.

Murdock, *Judge*: The petitioner contends that the unilateral determination of excessive profits in the amount of $400,000 was improper because prior thereto a bilateral agreement that its profits for that period were excessive only to the extent of $235,000 had been executed. The evidence on this point indicates that the petitioner signed a proposed bilateral agreement in October 1943 that its profits for 1942 were excessive to the extent of $235,000; the document was then sent to the renegotiating authorities in Boston; the petitioner was notified not long thereafter that the proposed agreement was not acceptable to the renegotiating authorities in Washington; the proposed agreement was never returned to the petitioner; the petitioner was advised at a hearing before the War Department Price Adjustment Board in April 1944 that it would have to return $125,000 of the amount received under contract 304 and $275,000 of the amount received on its other renegotiable sales made during 1942; and the unilateral order that the excessive profits for 1942 amounted to $400,000 was issued on August 14, 1944.

The petitioner seems to think that some representative of the renegotiating authorities may have signed the proposed bilateral agreement. It concedes that it can not win this point upon the evidence in the record, which fails to show the signing on behalf of the Secretary of War. The petitioner not only has failed to sustain this assignment of error, but the record affirmatively shows that the proposed bilateral agreement never became a bilateral agreement. It was not acceptable to the Secretary of War and those authorized to act for him in such matters and was never released or held out by them as an agreement executed with their authority or as one binding upon the Secretary of War. Thus, even if some representative signed it in the mistaken belief that he was acting with the authority and approval of the Secretary of War, nevertheless, it was still within the possession and control of the Secretary of War and the act of the subordinate never became binding upon the Secretary of War. Thus, the decision on this

point need not turn upon the failure of the petitioner to show that someone other than the petitioner's representative signed the proposed bilateral agreement.

The petitioner has put in issue the constitutionality of the Renegotiation Act of 1942 as applied to its 1942 sales. However, it makes no argument in its briefs on those assignments of error, in view "of the decision of this Court in the leading case of *Stein Brothers Manufacturing Co.* v. *Secretary of War*, 7 T. C. 863, and the pendency of several cases on various aspects of the question before the Supreme Court of the United States." Although the case of *Lichter* v. *United States*, 334 U. S. 742, holding the Renegotiation Act constitutional, was decided not long before the petitioner's reply brief was filed, the petitioner does not refer to it in its reply brief. See also *Ring Construction Corporation* v. *Secretary of War*, 8 T. C. 1070. It is held, following the cited cases, that the Renegotiation Act of 1942 is not unconstitutional in any respect as applied to this petitioner. Cf. *Yakus* v. *United States*, 321 U. S. 414, 447; *Glens Falls Portland Cement Co.* v. *Delaware & Hudson Co.*, 66 Fed. (2d) 490, 493; certiorari denied, 290 U. S. 697.

An important issue is whether contract 304 is or is not subject to renegotiation. Section 403 (c) (6) of the Renegotiation Act of 1942 provides that it shall be applicable to a contract like 304 "unless (i) final payment pursuant to such contract or subcontract was made prior to April 28, 1942." It is stipulated that all deliveries were made and the last payment was also made under that contract prior to April 28, 1942. Thus, contract 304 comes within the exception just quoted and is not subject to renegotiation.

The respondent bases his argument to the contrary upon a chain of circumstances which must be described briefly in order to be understood. Contract 304 was executed on January 8, 1941. The contract contained a so-called escalator clause providing that the prices were subject to adjustments for increases or decreases in labor and material costs. The first deliveries by the petitioner under the contract were late and the War Department, in order to permit the petitioner to make a claim under the escalator clause, entered into a supplement to the contract on November 23, 1942, revising the delivery schedule to correspond with the actual delivery dates. The petitioner, on October 22, 1942, made a claim for additional payments under the escalator clause, but that claim was withdrawn on October 27, 1943. The parties executed a so-called "Waiver of Rights under Escalator Clause" a day or two later, which provided in part: "Article 29, Price Adjustments [escalator clause], is hereby deleted from the basic contract." It further provided that both parties waived all rights under article 29, including rights to any payments thereunder. That closed the matter. The respondent argues from this chain of events that the

payment of April 13, 1942, was not a final payment. No payment on contract 304 was made after the payment of April 13, 1942. It is significant that the respondent never suggests a later date upon which final payment was actually made. The payment of April 13, 1942, turned out to be the final payment, although the question of whether or not the petitioner was to receive anything under the escalator clause was not settled until later. A later waiver of further payment or agreement that no further payment would be due on the contract can not be regarded as a final payment in order to make this contract subject to renegotiation. The question of whether or not the contract would be subject to renegotiation had there been some actual payment after April 28, 1942, is not involved in this case. Cf. Joint Statement by the War, Navy and Treasury Departments and the Maritime Commission, dated March 31, 1943; Joint Renegotiation Manual for Fiscal Years Ending on or Prior to June 30, 1943, issued by the Joint Price Adjustment Board, paragraph 341.2. Here there was no payment after that date and the exception clearly applies.

The final issue is as to the amount of profits on renegotiable sales which is to be deemed excessive. Several subsidiary questions are involved. The first is a question of fact and has to do with the amount of the sales of regular products which are subject to renegotiation. The petitioner contends that only $740,124 of sales of regular products are subject to renegotiation. Its method of segregating renegotiable from nonrenegotiable sales of regular products is explained in the record and a finding has been made in accordance with that evidence. The respondent attempted to show that the petitioner's method was inaccurate and reached an incorrect result. The evidence and arguments of the respondent on this point have been carefully considered, but the conclusion has been reached that the best evidence of renegotiable sales of regular products is that introduced by the petitioner.

Another subsidiary question under the final issue relates to Massachusetts excise tax paid for 1942 in the amount of $22,937. The respondent says in his brief, "these state income taxes must be excluded as a cost." However, he fails to support that statement by argument or the citation of any authority in point. The Massachusetts excise tax is a combination of income tax and tax upon the value of property. Section 403 (c) (3) of the Renegotiation Act of 1942 requires that the Secretary, in determining excessive profits, "shall recognize the properly applicable exclusions and deductions of the character which the contractor or subcontractor is allowed under Chapter 1 and Chapter 2 E of the Internal Revenue Code." The Massachusetts excise tax is deductible under section 23 (c) (1) of chapter 1 of the Internal Revenue Code. That tax has been allocated against the renegotiable and nonrenegotiable income of the petitioner for 1942 in the findings of fact on the basis of net income. The respondent, apparently be-

lieving, but not proving, that some of that tax may be refunded if the petitioner has to return excessive profits, would have the Court apply the provisions of section 403 (a) (4) (B) of the Renegotiation Act of 1943. The words and legislative history of that provision show that it made a decided change in the law. House Rept. No. 871, 78th Cong., 1st sess., pp. 35–37. Since the different provisions of the Renegotiation Act of 1942 alone are applicable to this case, they must be followed. This question was not decided in *Ring Construction Corporation* v. *Secretary of War, supra,* cited by the respondent.

The next subsidiary question under the final issue arises because the petitioner, in manufacturing the cartridge cases during 1942, used some property which had been fully depreciated for income tax purposes in prior years. It argues that reasonable allowance for depreciation on those items should either be deducted as costs in arriving at net profits or the same result should be reached by making adjustments for the same amounts as "favorable factors." The amounts to which the petitioner refers are not "properly applicable exclusions and deductions of the character which the contractor or subcontrator is allowed under Chapter 1 and Chapter 2 E of the Internal Revenue Code," within the meaning of section 403 (c) (3) of the Renegotiation Act of 1942, since no provision of the Internal Revenue Code allows deductions for fully depreciated assets. The question of whether any recognition should be given to these circumstances as a "favorable factor" will be discussed later. What has been said above also applies with respect to alleged reconversion costs.

There is some disagreement between the parties as to how cost of sales, selling expenses, and administrative expenses are to be allocated among the various classes of sales. Wherever the petitioner's allocation has been adopted by the respondent or has not been objected to by the respondent, or where the respondent's objections have not been deemed meritorious, the petitioner's allocation has been followed, except in one instance. The respondent accepted the petitioner's allocation of administrative expenses between cartridge case contracts and regular products on the basis of direct labor costs, but made an allocation from that point forward on the basis of cost of sales, whereas the petitioner continued on the basis of direct labor costs. The petitioner concedes, however, that in its computation about $34,000 of sales of regular products were erroneously treated as nonrenegotiable, whereas they were renegotiable. The record does not contain information sufficient to work out an accurate computation following either the method of the petitioner or that of the respondent. Generally, and in the cases where the Court has had to proceed alone, the allocations have been made upon the basis of sales.

The findings show that the petitioner's sales for 1942 subject to renegotiation amounted to $1,729,645, with net profit thereon of $451,731.

The ultimate question for determination is, What portion of the latter amount represents excessive profits. The petitioner argues that its excessive profits for 1942 did not exceed $81,040. It once was willing to concede that $235,000 of those profits were excessive, and in that concession it failed to include in renegotiable sales about $34,000 of sales which it now concedes were renegotiable. The respondent not only contends that the excessive profits amounted to $400,000, but he has made repeated unsuccessful attempts to amend his pleadings in order to claim that the excessive profits amounted to $500,000. He, of course, regards the profits on contract 304 as subject to renegotiation, but it has been decided herein that they were not subject to renegotiation.

The petitioner urges that numerous "favorable factors" should be considered and on the basis thereof the determination of excessive profits should be reduced. The respondent attempts to depreciate many of those factors and urges the consideration of others which he regards as unfavorable. All of the evidence and all of the arguments of counsel have been carefully considered in order to arrive at a just result. Among the many factors which have been considered are the previous business activity of the petitioner, the effect on the plant and regular business of the changes made to manufacture the cartridge cases, the interruptions in regular business, the reconversion problem, the risk assumed under the Government contracts, the plant, equipment, and capital required and the source thereof, the effort made, including the time devoted by the officers and the salaries paid, the efficiency and expedition with which the contracts were performed, the problems and difficulties involved, the size and volume of the operation, the methods used, the contribution to the war effort through methods developed and otherwise, the reductions in price, and the fact that the petitioner had preserved valuable facilities acquired in World War I which were ready for installation and were actually used in producing cartridge cases for World War II, although the assets were fully depreciated prior to 1942.

Some of those factors are more favorable than others. Some are not particularly favorable. The petitioner's record for efficiency was favorable, as evidenced by the fact that it received the Army and Navy "E" award. There is other evidence of the fact. The fact that the petitioner was able to use fully depreciated assets carried over from World War I is an important favorable factor. The availability of such equipment no doubt contributed to the war effort, although this conclusion must be drawn more from inference than from direct evidence. Furthermore, the fact that the petitioner deducted no depreciation on that equipment in computing its 1942 profits results in profits where none would appear otherwise and, to the extent that

those profits are determined to be excessive, contributes to the war effort by reducing the price of the cartridge cases. It would seem necessary to permit both the Government and the contractor to share the saving thus effected in order to carry out the purpose of the Renegotiation Act. It is impossible to appraise all of these factors with mathematical accuracy, but a conscientious effort has been made to give them the weight to which they seem to be entitled. All of the various checks which have been suggested or which have come to mind have been considered in an effort to arrive at a figure which would seem most justified by the record. The ultimate conclusion is that the petitioner's profits for 1942 subject to renegotiation were excessive in the amount of $255,000.

Reviewed by the Court.

*An order will issue in accordance herewith.*