W. Tip Davis Company, Petitioner, *v.* Robert P. Patterson, Under Secretary of War, Respondent.

Docket No. 52–R.    Promulgated March 10, 1949.

*Urban E. Wild, Esq.,* and *Milton Cades, Esq.,* for the petitioner.
*Frederick N. Curley, Esq.,* for the respondent.

---

\* \* \* \* \* \* \*

336

OPINION.

MURDOCK, *Judge*: The first point for decision under issue (1) is whether sales made by the petitioner during the period here in question to Army post exchanges, officers' clubs, Navy ship service stores, and numerous armed forces organizations were subject to renegotiation. The evidence on this point is extremely limited. It shows that sales in the total amount of $4,326.61 were made to Army post exchanges, ship service stores and various military organizations and clubs, and were paid for after April 28, 1942. The parties, in discussing this point, make no distinction between the sales made to Army post exchanges and the relatively smaller sales made to other organizations. Section 403 (c) (1) of the Renegotiation Act of 1942, as amended, provided for renegotiation of any contract with a Department to eliminate excessive profits, and Department was defined to include the War Department. Sec. 403 (a) (1). The respondent relies upon *Standard Oil Co. of California* v. *Johnson*, 316 U. S. 481, in which the Court stated that post exchanges "are integral parts of the War Department."

That case did not involve renegotiation and is not determinative of the point here under consideration. Although a post exchange may be regarded as a part of the War Department for some purposes, nevertheless, it is not like the Quartermaster Corps, the Signal Corps, or other parts of the War Department for which Government funds are appropriated and spent. The Court also said in the *Johnson* case, *supra*, that "The Government assumes none of the financial obligations of the exchange." Appropriated funds have been used by the War Department to provide suitable buildings for post exchanges, but post exchanges have no appropriated funds with which to make purchases of merchandise or equipment. *Standard Oil Co.* v. *Johnson, supra;* 27 Stat. 178; 10 U. S. C. A., Sec. 1335; Opinion of the Judge Advocate General, Feb. 20, 1943; Army Regulations 210–65 (19 Mar. 1943) ¶ 33 (h). Post exchanges and the other organizations to which the sales in question were made buy with their own funds, which belong to the share-holding units of which each exchange consists. This matter of the source and ownership of funds used to purchase the goods is vital in renegotiation.

The statutes providing for renegotiation were not intended to prevent excessive profits from contracts on which the Government was not obligated. The legislative history of those provisions shows that it was "Government" "appropriated" funds which had "been taken

from the taxpayers" which were to be "returned to the Treasury thereafter to be reappropriated by Congress." Congressional Record, Senate 4/7/42, p. 3481; same, p. 3495; Senate 10/10/42, p. 8312; House 4/21/42, p. 3697. The renegotiating authorities issued manuals stating that contracts such as those involved herein were not subject to renegotiation. The Joint Renegotiation Manual, covering fiscal years ended before July 1, 1943, secs. 332.5 and 332.6; Renegotiation Regulations, War Contracts Price Adjustment Board, applicable to fiscal years ending after June 30, 1943, secs. 332.6 and 332.7. The respondent's brief does not suggest a valid reason for subjecting these particular sales to renegotiation. It is held that the sales in the amount of $4,326.61 were not subject to renegotiation.

The petitioner made sales of $121,549.67 to the Army and Navy upon purchase orders. Another question under the first issue is whether sales on purchase orders are subject to renegotiation. Section 403 of the Renegotiation Act provides that contracts with the Departments are subject to renegotiation. The petitioner contends that a purchase order is not a contract within the meaning of that word as used in section 403. It argues that Congress, in enacting laws, has always distinguished between contracts and purchases or purchase orders and, when it mentioned contracts but did not mention purchase orders in section 403, it intended that the latter should not be subject to renegotiation. Congress did not define contracts as used in that section. A subcontract is defined in section 403 (a) (5) to include a purchase order. The petitioner argues that this specific inclusion under subcontracts indicates an intention to exclude when the purchase order comes directly from a Department. Section 403 (a) (5) was enacted to show that the act was broad in its scope rather than to limit its application, *Supply Division, Inc.*, 9 T. C. 1103, and does not support the petitioner's argument. The purpose and legislative history of renegotiation indicate a Congressional intention that purchase orders, which are a type of contract and could result in excessive profits just as readily as any other kind of direct contract, be subject to renegotiation. Cf. Report of the Special Committee Investigating the National Defense Program, 78th Cong., 2d sess., Rept. No. 10, part 16, p. 60; part 5, p. 231; *National Electric Welding Machines Co.*, 10 T. C. 49. The purpose of renegotiation was to prevent war profiteering from the expenditure of Government funds necessary in the prosecution of the war. There would be no reason to limit the profits derived through a direct sale to a Department of the Government evidenced by one type of contract but not to limit similar profits derived from a sale evidenced by a purchase order. It is held that the sales made on purchase orders are subject to renegotiation. The renegotiable sales of the petitioner for the period here involved were

in excess of $100,000, the renegotiable minimum fixed in section 403 (c) (6).

The second issue relates to the amount, if any, of excessive profits realized by the petitioner during the nine-month period ended December 31, 1942, on its renegotiable sales in the amount of $181,363. The parties disagree as to two alleged expenses. The petitioner paid rent of $1,800, or $200 a month, for the premises which it occupied. It contends that this rent was low, a reasonable rental for the space would have been $600 a month, and the difference of $400 should be allowed as an additional deduction in computing profits. There is no authority in the statute for allowing a deduction for rent in excess of the amount actually paid. However, if a low rental were to be shared with the Government through low prices or a return of some of the profits, it might be considered as a "favorable factor." *Albert & J. M. Anderson Manufacturing Co.*, 12 T. C. 132. The renegotiators have determined that reasonable salaries to the partners for the period here in question would amount to $13,050, and the respondent recognizes that a reasonable amount should be allowed for partners' salaries in accordance with Joint Renegotiation Manual, sec. 352.1, and sec. 403 (d). The petitioner contends that the allowance should be $38,880. All of the evidence on this point has been considered and the conclusion has been reached that $22,500 would be a reasonable allowance for partners' salaries during the period in question.

The parties agree that the petitioner had total sales of $214,206.92, cost of sales in the amount of $129,416.53, and expenses of $12,062.13, not including any allowance for salaries to partners, during the last nine months of 1942. They disagree, however, on the method of allocating those costs and expenses between renegotiable and nonrenegotiable sales. The petitioner maintains that the allocation should be made in accordance with the method of accounting which it used, whereas the respondent contends that the accounting method used by the petitioner was neither complete nor accurate and, accordingly, the allocation should be made on the basis of sales. The difference in results is not great. The accounting method used by the petitioner to allocate cost of goods sold was not accurate. It had no method of allocating expenses. Both cost of goods sold and expenses have been allocated upon the basis of sales.

The petitioner contends that its profits from renegotiable sales were not excessive, whereas the respondent contends that they were excessive to the extent of $35,000. The sales to post exchanges and similar organizations were included in renegotiable sales and only $13,050 was allowed for partners' salaries in arriving at the determination that profits were excessive to the extent of $35,000. This Court, after

considering all of the evidence, including the nature of the business, the risks assumed, the investment involved, the performance, the difficulties overcome, and all evidence bearing on any other factor which might be considered, has come to the conclusion that the profits of the petitioner from renegotiable sales during the last nine months of 1942 were excessive in the amount of $27,500.

Reviewed by the Court.

*An order will issue in accordance herewith.*