Kenyon Instrument Co., Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 24265.    Promulgated April 11, 1951.

*Henry Cassorte Smith, Esq.*, for the petitioner.
*Ellyne E. Strickland, Esq.*, for the respondent.

OPINION.

VAN FOSSAN, *Judge:* The first issue is whether the petitioner is entitled to a deduction in 1944 for repayments in that year of price adjustments on war contracts. The facts are not in dispute and may be summarized briefly as follows: In 1943 petitioner came to "an agreement" with the Office of the Supervisory Cost Inspector, U. S. Navy, to the effect that petitioner had overcharged its customers, who were prime contractors, for business done for them by petitioner in 1942. It was stated in a letter from the Cost Inspector to the petitioner that "as agreed to at the conference, you are to issue credit memoranda to the prime contractors in the amounts as indicated" in that letter. The parties finally agreed on a refund in the total amount of $393,359.50, which amount the petitioner was to refund to its customers in quarterly payments. In the year 1943 the petitioner

refunded the amount of $197,952.03 and in the year 1944 the amount of $195,407.47. The Navy Price Adjustment Board subsequently considered petitioner's 1942 profits and on February 29, 1944, issued to petitioner a clearance letter constituting a final determination that petitioner realized no excessive profits for its year 1942 on contracts subject to renegotiation. Section 43 of the Internal Revenue Code applies and is set forth in the margin.[1]

The petitioner contends that each of these amounts is deductible in the year in which paid. The respondent contends that the full amount was accruable and deductible in 1943. The substance of the petitioner's argument is that the "agreement" entered into in 1943 was not binding on petitioner and therefore payments made thereunder were deductible (1) when actually paid, or (2) after the issuance of the clearance letter by the Navy Price Adjustment Board in February of 1944. Petitioner characterizes its payments under the 1943 agreement as "voluntary" and insists that it was under no binding obligation to make the price adjustments until 1944. In support of its position the petitioner cites the familiar cases to the effect that an expense accrues when it becomes a fixed, definite, legal obligation. That principle is of long standing but it affords petitioner no assistance here. There is opposed to the petitioner's argument the very substance of the principles of accrual accounting. In *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281, it was said that "* * * a taxpayer may not accrue an expense, the amount of which is unsettled or the liability of which is contingent * * *." It cannot be seriously argued that the petitioner's liability for the full amount was unsettled in 1943. There is a certain quantum of reasonableness implied in the term "unsettled." "The test is whether a taxpayer is justified in entertaining a reasonable expectation that an expense will be incurred." *Helvering* v. *Russian Finance & Construction Corp.*, 77 F. 2d 324.

We see little merit in the petitioner's view that the full amount was not accruable in 1943 because of an unenforceable agreement. It is apparent that, enforceable or not, petitioner considered the agreement sufficiently valid to pay out in 1943, under its terms, approximately one-half of the amount due. It is but to state a truism to say that a taxpayer may not shift deductions from year to year by prematurely accruing a deduction not then due. Petitioner's argument that the payments were "voluntary" is more persuasive of the view that the full amount was to be paid in due course and, there-

---

[1] SEC. 43. PERIOD FOR WHICH DEDUCTIONS AND CREDITS TAKEN.

The deductions and credits (other than the corporation dividends paid credit provided in section 27) provided for in this chapter shall be taken for the taxable year in which "paid or accrued" or "paid or incurred," dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period. * * *

fore, accruable, than it is of any doubts as to the validity of the agreement.

Although there is much discussion on brief of the authority of the Supervisory Cost Inspector, as opposed to that of the contract renegotiation personnel, nothing appears that would indicate that what petitioner considered to be formal approval of the agreement with the Cost Inspector would not follow in due course. Petitioner's ready acquiescence in refunding the amounts finally agreed on with the Cost Inspector is not consistent with the position that more formal approval of that official's action was required to make the obligation binding for accural purposes. The renegotiation cases[2] cited by petitioner for its view that the obligation was not binding until the clearance letter was signed in 1944, are not determinative of the question of whether the amount should be properly accrued in 1943. These cases are more concerned with the statutory authority of the signatories to various renegotiation agreements and the validity thereof as affecting renegotiation of war contracts. Controversies of that nature are not controlling in the present case where we are concerned only with the "reasonable expectation that an expense will be incurred" so as to dictate its accrual.

The very reason for an accrual system of accounting is that it provides a means of relating, as nearly as possible, incurred but unpaid costs to true income. *United States* v. *Anderson*, 269 U. S. 422. It is a necessary assumption that obligations incurred in the normal course of business will be duly discharged. *United States* v. *American Can Co.*, 280 U. S. 412. Any system of accounting of this nature must of necessity include certain approximations and resulting inaccuracies. As above suggested, the answer to the test of whether or not an item should be properly accrued by the taxpayer depends inevitably upon the reasonableness of the possibility that it will eventually be paid. It is apparent from the evidence of record that in 1943 it was fully intended that the petitioner would make the price adjustments in due course in accordance with the terms of the agreement of that year and that petitioner would not be justified in believing that the refunds would not be paid. In our opinion, it follows that the full amount should be accrued in 1943. We hold, therefore, that respondent did not err in disallowing the deduction taken in 1944 for the amounts paid in that year.

There is one other point which petitioner discusses as relating to "the equities of the situation." We have set out in our Findings of Fact the ruling signed by a Deputy Commissioner to the effect the refunds were deductible in the year actually made and the later retraction of the ruling which was signed by the same official. Peti-

---

[2] *Albert & J. M. Anderson Manufacturing Co.* v. *Secretary of War*, 12 T. C. 132; *Lord Manufacturing Co.* v. *Stimson*, 73 F. Supp. 984.

tioner states that "it was not obliged to look beyond" the first ruling "to determine its correctness." We assume that the purpose of petitioner's argument is to demonstrate that an estoppel exists. It is well established that the various administrative rulings represent merely the current opinion of the agency concerned as applied to a given set of facts, and that the Commissioner may revise an earlier ruling or decide a question differently from year to year, at least until the administrative determination is dignified by precedent and sanction by higher authority. See *Agricultural Securities Corporation*, 39 B. T. A. 1103, 1111; *South Chester Tube Co.*, 14 T. C. 1229, 1235. The defense of an estoppel is not available to petitioner here.

The remaining questions concern (1) the deduction for Federal tax purposes of petitioner's payment of New York State franchise taxes, and (2) the year in which petitioner should have included as income the refunds received for state franchise taxes. Because the result as to these questions largely turns on an analysis of the complicated facts involved, we deem it necessary to reassemble such of the facts as are pertinent.

In July 1944 petitioner filed its New York State franchise tax return based upon net income for 1943, which income was not reduced by any of the refunds referred to under the first issue above. The 1943 franchise tax liability so computed, was in the amount of $62,578.91. Petitioner filed its New York State franchise tax return, based on net income for 1944, and showed thereon a liability in the amount of $47,561.52. The aggregate of these two amounts, $110,140.43, was deducted in full on petitioner's Federal income and excess profits tax returns for the year 1944. Respondent contends that this deduction should be only $86,373.22, the amount determined by respondent to be the correct franchise tax after income was reduced by the repayments referred to in the first issue.

On June 12, 1946, petitioner filed application for a revision in its liability for the New York State franchise taxes referred to above, which application was based on its reduction of reported income for the years 1943 and 1944 due to the refunds to customers in those years. On February 21, 1947, the New York State Tax Commission replied to this application stating that refunds of state franchise taxes would not be considered until petitioner's Federal tax liability for 1943 and 1944 was finally determined. On April 27, 1946, petitioner again requested a refund of the state franchise taxes based on its net income for 1943. This application was unrelated to the one just referred to above and was based on a formal renegotiation agreement with the Navy Price Adjustment Board signed on January 31, 1945, whereby petitioner agreed to repay excess profits in the amount of $731,924 relating to business done in 1943.

On April 14, 1947, the New York Corporation Tax Bureau allowed a refund to petitioner in the amount claimed in the request for refund filed on April 27, 1946. On April 16, 1947, petitioner filed a request for refund of its state franchise taxes which taxes were computed on 1944 income. This request of April 16, 1947, was based on another formal renegotiation agreement with the Navy Price Adjustment Board made on December 27, 1945, whereby petitioner agreed to repay excessive profits of $485,446 on war contracts for the year 1944. The respondent contends that the refundable amounts of petitioner's New York franchise taxes for 1943 and 1944 should be accrued as taxable income in 1945.

As to the question of the deduction in 1944 for the state franchise taxes, the critical point is whether petitioner knew all the factors necessary for a determination of its liability for franchise taxes paid in that year. The record shows indisputably that when petitioner filed its franchise tax return based on net income of 1943 and 1944, the refunds discussed in the first issue were, by that time, fully paid. Further, petitioner's original Federal returns for 1943 accrued the full amount of the refunds. In its amended return for 1943, petitioner changed this situation so as to deduct only the amount paid in 1943, but by the time petitioner filed its franchise tax returns there was no question that its income for 1943 or 1944 was to be reduced by the refunds, depending only on whether the repayments were accruable in full in 1943 or deductible in both years 1943 and 1944. In other words, there was no question at the end of 1944 that the petitioner would make the repayments since they were then paid in full. Yet petitioner, in filing its franchise tax returns, failed to reduce its net income on which the franchise tax was based in *either* year, 1943 or 1944. Petitioner, therefore, computed and paid its franchise tax in 1944 based on an amount of income which was obviously incorrect, and now insists that it is entitled to a deduction for such overpayment of its franchise taxes. The question becomes whether a deduction is authorized for payment of that part of a tax for which there is no apparent liability, and where the tax so paid would have been otherwise deductible. This question has been resolved against petitioner in *Hart Furniture Co.*, 12 T. C. 1103, reversed on another issue, (C. A. 5), 188 F. 2d 968. In that case the taxpayer erroneously overpaid its Federal excise tax liability (deductible on its Federal income tax return). We relied on *Cooperstown Corporation* v. *Commissioner*, 144 F. 2d 693, certiorari denied, 323 U. S. 772, saying:

* * * Here, no obligation existed, or reasonably appeared to exist, for petitioner's payment of that part of the excise tax disallowed as a deduction by respondent and later refunded. The overpayment of this tax, for which no actual or apparent liability existed and which was made only because of petitioner's own error, can not be considered as an ordinary and necessary business

expense, deductible under section 23 (a) ; and it is obviously not deductible under section 23 (c), because of the provisions of section 23 (c) (1) (F) as added to the Internal Revenue Code by section 111 of Revenue Act of 1943. * * *

We see no distinguishing feature in the instant case. Petitioner obviously treated the refunds made to its customers in 1943 and 1944 inconsistently on its Federal returns and its state franchise tax returns.

Both parties argue the applicability of *Taylor Instrument Companies*, 14 T. C. 388. The syllabus of that case is sufficient alone to show that it is not determinative of the question here:

New York State franchise taxes computed on income, *held* deductible in full by an accrual basis taxpayer in year *when liability arose*, notwithstanding that income and corresponding tax were reduced in a subsequent year as a result of renegotiation. [Latter emphasis added.]

The opinion in the *Taylor* case states that petitioner "owed New York State franchise taxes in the amount specified and was required to pay them." But here petitioner did not owe the amount of the taxes in dispute and such fact was apparent when the state tax return was filed.

We hold, therefore, that respondent did not err in disallowing a deduction for that part of petitioner's franchise tax liability overpaid in 1944.

The issue remaining involves the disposition of the refund of New York State franchise taxes made to petitioner in 1947 on the basis of petitioner's requests therefor filed on April 27; 1946 and April 16, 1947, with respect to the formal renegotiation agreements of January 31, 1945 and December 27, 1945, respectively, whereby petitioner agreed to refund excessive profits in the amounts of $731,924 and $485,446, respectively, relating to war contracts for 1943 and 1944, respectively.

It is respondent's position that these refunds of state franchise taxes should be accrued as taxable income in 1945. We agree. This issue is disposed of by our holding in the recent case, *H. O. Boehme, Inc.*, 15 T. C. 247. There, similar renegotiation agreements were reached in 1944 and 1945 with respect to business done during petitioner's years 1943 and 1944, respectively. Pursuant to these renegotiation agreements, refunds of New York State franchise taxes were paid petitioner in 1945, relating to the 1944 renegotiation agreement, and in 1946 petitioner received a state franchise tax refund as a result of the 1945 renegotiation agreements. Petitioner contended there that both refunds should be included in its 1944 income. We said that:

* * * It is thus apparent that by the end of 1944 petitioner knew all of the factors necessary to a determination of its credit based on its 1943 net income after renegotiation. It follows that the amount of [the refund relating

to the renegotiation agreement consummated in 1944] was properly accruable in petitioner's taxable year 1944. See *Taylor Instrument Cos.*, 14 T. C. 388.

With respect to the amount of $6,265, however, all of the elements necessary to ascertain the amount of credit were not known at the end of 1944. One very vital factor, the final determination of excessive profits on its war contracts, was missing. Petitioner agreed to the determination of excessive profits on its war contracts on October 17, 1945. By virtue of this agreement all of the factors necessary to a determination of the petitioner's credit or refund of its New York franchise tax based upon its 1944 net income after renegotiation became known in its tax year 1945 and not prior thereto. We accordingly hold that the amount of $6,265 is properly accruable in petitioner's taxable year 1945.

There is no distinction between the *Boehme* case and the present proceedings as to this question. The renegotiation agreements here were both made in 1945 and related to petitioner's business done during its years 1943 and 1944. All the factors necessary to the accrual of these refunds were known to petitioner in 1945. It follows from the *Boehme* case that the refunds were income to petitioner in 1945. We hold, therefore, that respondent did not err in taxing these amounts to petitioner in that year.

*Decision will be entered under Rule 50.*