PARK SHERMAN CO., PETITIONER, *v.* THE UNITED STATES OF AMERICA, RESPONDENT.

PARK BLOOMINGTON, INC., PETITIONER, *v.* THE UNITED STATES OF AMERICA, RESPONDENT. ·

Docket Nos. 698–R, 707–R, 699–R.  Filed October 30, 1957.

*Frank J. Delaney, Esq.*, for the petitioners.

*Frederick N. Curley, Esq., Charles J. Steele, Esq., Harland F. Leathers, Esq.*, and *Robert Kernan, Esq.*, for the respondent.

FISHER, *Judge:* The War Contracts Price Adjustment Board determined that petitioners had the following excessive profits from certain contracts subject to renegotiation:

| Petitioner | Excessive profits | Fiscal year |
|---|---|---|
| Park Sherman Company | $230,000 | July 1, 1944, to June 30, 1945 |
|  | 99,898 | July 1, 1945, to June 30, 1946 |
| Park Bloomington, Inc | 16,000 | Jan. 9, 1945, to Dec. 31, 1945 |

By motions duly granted, the United States was substituted for the War Contracts Price Adjustment Board as respondent in each of the three proceedings which were then consolidated. The principal issue is whether petitioners had sales subject to renegotiation during the fiscal years involved. If decided affirmatively, a further issue to be decided is whether petitioners realized excessive profits on those sales in the amounts determined.

### FINDINGS OF FACT.

Certain facts have been stipulated and are hereby found.

Park Sherman Company, hereafter referred to as petitioner, and Park Bloomington, Inc., hereafter referred to as Bloomington, are corporations organized and existing under the laws of Illinois. Petitioner is a successor to Shanklin Manufacturing Company, organized about 1932. Since that date Jacob S. Sherman and members of his family have owned it. Bloomington, at all times petitioner's wholly owned subsidiary, conducted all business with its parent.

During part of World War II, the Quartermaster General, United States Army, procured cigarette lighters for all branches of the United States Armed Forces. Petitioner, one supplier of lighters, entered into written contractual arrangements with the United States, acting by and through the Quartermaster General, to supply such lighters.

About November 1943, the Quartermaster General was charged with the responsibility of purchasing cigarette lighters for the Army. At about this time he assumed central procurement of lighters for all Armed Forces, and also assumed procurement previously done by the Army Exchange Service. Accordingly, all Army Exchange Service contracts were canceled and where necessary, replaced by contracts

entered into by the United States acting through the Quartermaster General. A buyer from the Jersey City Quartermaster Depot, assigned this function, proceeded to buy lighters for the Quartermaster Corps, for resale to post exchanges.

The Quartermaster General immediately assigned to the Army Exchange Service, certain contracts for lighters entered into by him and petitioner. The renegotiation clauses in those contracts were overprinted. On December 6, 1943, the Navy Department notified Ship's Service Activities that ship's service departments within the continental United States would procure lighters only by purchase orders forwarded to the Ship's Service representative, United States Navy, at the Army Exchange Service. Ship's Service Activities afloat and outside the United States were to obtain lighters through the Navy Bureau of Supplies and Accounts, at least after January 1, 1944.

Normally, the Quartermaster General prepared a list of items, including lighters, based partly on requests from theater commanders as to quantities needed for a future period. On receiving the requisition then issued, the Jersey City Quartermaster Depot entered into contractual arrangements for lighters with various suppliers, including petitioner.

Prior to World War II, petitioner manufactured miners' lamps and cigarette lighters. Because of the scarcity of lighters, a procurement specialist for the Quartermaster General requested in 1944 that petitioner manufacture "Zippo"-type lighters, the type in greatest demand among members of the Armed Forces.

Petitioner, from May 26 through September 30, 1945, entered into 17 written agreements with the Jersey City Quartermaster Depot, acting on behalf of the Quartermaster General, wherein it promised to supply lighters. About December 20, 1944, it entered into a similar written agreement with the Navy.

During the period involved, petitioner realized income of $55,661.57 from shipments made to ship's service departments at various Navy depots and Army exchanges. Petitioner did not sell or ship these items under the aforementioned 18 contracts.

Lighters purchased under the Quartermaster contracts not assigned to the Army Exchange Service were to be paid for in two ways:

(a) Petitioner shipped lighters having total sales prices of $748,537.40 during the fiscal year ended June 30, 1945, and $228,560.70 during the period ended December 31, 1945, to various War and Navy Department depots. The usual method of payment followed

with respect to these shipments was for the Government to issue Treasury warrants to petitioner through the Quartermaster General or the Navy after submission of vouchers by petitioner.

(b) Petitioner shipped lighters having a total amount of $118,723 for the period ended June 30, 1945, and $125,120.90 for the period ended December 31, 1945, to various governmental agencies, principally ship's service departments in various naval depots. Petitioner billed those agencies although the lighters had been contracted for by the War Department. With respect to the seven contracts so handled:

All contracts arose from offers made by petitioner and accepted by Quartermaster contracting officers. All contained renegotiation clauses.

Two contracts, dated June 27, 1944, specifically deleted paragraphs relating to assignment to the Army Exchange Service. The Quartermaster Corps permitted Navy Ship's Service representative to utilize these contracts. Under one of the two contracts, petitioner shipped to and billed various ship's service departments, and in some instances at least, received payment by checks drawn on private banks. Petitioner made some of these shipments to the officers in charge at Navy depots. Petitioner, in applying for Government assistance, described this last contract as "prime," stating that lighters were being made exclusively for this agency.

The Quartermaster General assigned five of these contracts to the Navy Department. One, dated December 30, 1944, includes 93,888 lighters also covered in the one contract entered into directly with the Navy Department. Under this same assigned contract, the Quartermaster Corps also placed orders, immediate execution of one of which it requested in March 1945. In September 1945, petitioner forwarded refund checks due on this contract, payable to the Treasurer of the United States, to the Jersey City Quartermaster Depot. Twice in July 1946, the Quartermaster General requested a complete statement of deliveries, prices, refunds, and refund checks relative to price reductions, since he had no record of receiving the benefit of the price reductions.

On another of the contracts assigned to the Navy, petitioner received a preference rating.

The Treasury warrants issued to petitioner were drawn upon a military appropriation not in the nature of a revolving fund. No other Department of the Government had a contract with the War Department to purchase lighters from it.

Petitioner's sales, operating profits, and ratio of operating profits to sales for 1936 through 1944 were as follows:

| Year | Sales | Operating profits | Ratio of operating profits to sales |
|---|---|---|---|
| 1936 | $425, 608 | $86, 271 | 20. 3 |
| 1937 | 493, 630 | 66, 545 | 13. 5 |
| 1938 | 396, 083 | 8, 120 | 2. 1 |
| 1939 | 429. 528 | 15, 023 | 3. 5 |
| 1940 | 455, 224 | 19, 921 | 4. 4 |
| 1941 | 495, 177 | 19, 020 | 3. 8 |
| 1942 | 671, 034 | 79, 826 | 11. 9 |
| 1943 | 752, 127 | 101, 617 | 13. 5 |
| 1944 | 640, 624 | 81, 934 | 12. 8 |
| Total | 4, 759, 035 | 478, 277 | |

During the year ended June 30, 1945, and the 6 months ended December 31, 1945, petitioner had the following sales and profits:

| Sales | Period ended June 30, 1945 | 6 months ended Dec. 31, 1945 |
|---|---|---|
| Lighters (contracts, rebates added) | $988, 390. 50 | $588, 145. 60 |
| Other lighters | | 25, 512. 61 |
| Universal lamps | 146, 821. 11 | 72, 695. 97 |
| Flints | 27, 362. 11 | 29, 826. 59 |
| Calendar refills | 26, 983. 54 | 10, 189. 46 |
| Miscellaneous | 830. 37 | 887. 69 |
| Cigarette cases | | 5, 071. 74 |
| (Less discounts) | (2, 551. 74) | (865. 91) |
| Total | 1, 187, 835. 89 | 731, 463. 75 |
| Net operating profits | 354, 713. 00 | 198, 445. 19 |

From January 1 through June 30, 1946, petitioner sold $32,900.40 worth of lighters under the contracts and also had income of $55,-661.57 from shipments made to ship's service departments at various Navy depots and Army exchanges which were not sold or shipped under the contracts.

Petitioner did not have renegotiable receipts severally or in combination with Bloomington in the fiscal year ended June 30, 1946, in the aggregate of $500,000. Petitioner had receipts totaling more than $700,000 subject to renegotiation during its year ended June 30, 1945. Bloomington, together with petitioner, had sales totaling more than $500,000 during 1945.

Petitioner had excessive profits as determined by respondent in its fiscal year ended June 30, 1945. Petitioner had no excessive profits in its fiscal year ended June 30, 1946. Bloomington had excessive profits as determined by respondent.

#### OPINION.

Sales pursuant to 18 separate agreements are in controversy here. Petitioner regards 4 as "true bilateral contracts." These contracts

were entered into by petitioner and a representative of the War Department. The items involved may be stated to have been intended generally for resale. They were paid for by Treasury warrants, and shipments and billings were made directly to the contracting agency.

Petitioner contends that sales under these contracts are not renegotiable because lighters were purchased for resale and payments from the Treasury in substance were advances to be reimbursed by the resale agencies from nonappropriated funds. Respondent's view is that the Renegotiation Act of 1942, as amended, section 403 (a) (1) [1] and (c) (6),[2] requires renegotiation of all contracts with the War Department.

The evidence, while less complete than might be desired, does indicate that the lighters paid for by Treasury warrants were purchased primarily for resale. Similarly, the logical inference is that the War Department advanced appropriated moneys with the expectation of being reimbursed from nonappropriated funds of the resale agencies receiving shipments. Proof of this latter point is obviously difficult since internal governmental procedures cannot always be sufficiently traced so as to enlighten.

Even if petitioner can establish its two factual contentions, the conclusion it urges does not follow. In section 403 (a) (4) (A)[3] and (c) (6), and elsewhere, the statute is made applicable to all contracts with the War or Navy Departments subject to certain exceptions, all but one of which is totally immaterial and that bearing no effect on this particular contention. There can be no doubt that the contracts were entered with the War Department and that said Department was liable under those contracts. Indeed, petitioner does not urge otherwise. Nothing in the Renegotiation Act excludes or exempts contracts otherwise subject to renegotiation because the Department intended to resell the items purchased or because appropriated funds advanced might be reimbursed from nonappropriated funds.

[1] SEC. 403 (a). For the purposes of this section—
(1) The term "Department" means the War Department, the Navy Department * * *
[2] SEC. 403 (c) * * *
(6) This subsection shall be applicable to all contracts and subcontracts, to the extent of amounts received or accrued thereunder in any fiscal year ending after June 30, 1943, * * * unless (A) the contract or subcontract provides otherwise pursuant to subsection (i), or is exempted under subsection (i), or (B) the aggregate of the amounts received or accrued in such fiscal year by the contractor or subcontractor and all persons under the control of, or controlling or under common control with the contractor or subcontractor, under contracts with the Departments and subcontracts * * * do not exceed $500,000 * * *. If such fiscal year is a fractional part of twelve months, the $500,000 amount * * * shall be reduced to the same fractional part thereof for the purposes of this paragraph.
[3] SEC. 403 (a). For purposes of this section—
*       *       *       *       *       *       *
(4) (A) The term "excessive profits" means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this section to be excessive. * * *

Petitioner's reliance on *W. Tip Davis Co.* v. *Patterson,* 12 T. C. 335, seems to us misplaced. Although that case considered the source and ownership of funds vital in determining renegotiability, it must be remembered that in that case there was no underlying primary contract with any Department enumerated in the Act, and all shipments were pursuant to purchase orders directly from resale activities. We specifically held that the Act was "not intended to prevent excessive profits from contracts on which the Government was not obligated." As to these 4 contracts, at least, the War Department, and therefore the United States Government, was legally obligated, thus distinguishing the *Davis* situation.

Subject to consideration of the "floor" established by section 403 (c) (6), discussed below, we hold that sales pursuant to the 4 "true bilateral contracts" between petitioner and the War Department are renegotiable.

Of the 14 other agreements, the 4 that were formally assigned to the Army Exchange Service are considered later.

Petitioner is unwilling to characterize the other 10 documents as contracts, but denominates them as "open-end price agreements." Petitioner thus centers its argument on the belief that the Government was not obligated by these agreements, the principle of *W. Tip Davis Co.* v. *Patterson, supra,* then being applicable and sales pursuant to these agreements not being renegotiable.

Petitioner contends that failure to specify the place and exact time of delivery, as well as its agreement to ship only those quantities specified in purchase instruments to be executed by various requisitioning offices to which petitioner was to look for payment, indicate a lack of mutuality, and that these documents are not contractually binding. The documents do include petitioner's offer to furnish lighters during the agreed period in a stated quantity at a set price in accordance with prescribed packing and delivery instructions. A Quartermaster contracting officer accepted the offer in writing.

These contracts are similar to those considered in *United States* v. *Purcell Envelope Co.,* 249 U. S. 313, where the envelope company contended that it "had a contract which entitled it to furnish all the stamped envelopes and wrappings * * * which the Post Office Department *should need* * * *." The Court so construed the contract which provided that the envelope company was to "furnish and deliver promptly and in quantities as ordered" the envelopes and wrappers "that it may be called upon by the Post Office Department to furnish during the four years." The Court, in rejecting the Government's contention that it was required only to order a nominal supply from the contractor, said, in part (249 U. S. at 322) : "It is difficult to treat the contention seriously."

The *Purcell* case was distinguished in *Willard Co.* v. *United States*, 262 U. S. 489, 493. The *Willard* case involved somewhat similar contracts, the contractor specifically agreeing to supply coal up to the amounts specified, but the Government not being "obligated to order any specific quantity." The parties apparently regarded the actual ordering as entirely discretionary, and the Court declared the contract unenforcible for lack of consideration and mutuality. Upon detailed comparison, we must agree with respondent that the agreements here are of the type upheld in *Purcell*. This view is confirmed by the specific agreement that the inability to determine the exact requirements would not "relieve the Government of its obligation to order all of the supplies" needed. Rather than being only pricing agreements, not obligatory on the Government, these documents are complete contracts creating obligations enforcible by and against both parties even though the allocation and destination of specific shipments were reserved to later action by various requisitioning offices. The Court, in *Purcell*, emphasized the substantial needs of the Post Office Department, a factor which is paralleled by the need of the contracting Department of the Government in the instant case, where petitioner produced the lighters involved at the urging of the Quartermaster Corps representative who accepted many of the contracts here involved on behalf of the Government.

Neither the letters from the Army Exchange Service asserting that petitioner has no claim for unordered balances, nor the Navy report indicating that the Army Exchange Service would be responsible for supplying lighters to ship's service stores is in any way pertinent to this discussion since those documents apply only to agreements specifically assigned to the Army Exchange Service.

The ruling of the Comptroller General,[4] holding contracts invalid where there was a known multiplicity of awards and where the invitation for offers expressly denied that the resulting contracts would be mandatory, is inapplicable here as petitioner has shown neither characteristic to have existed. Neither this authority nor any others to which we are referred in any way show that the Government was not fully liable under these contracts.

Petitioner then argues that the direct shipments to various exchanges, direct billing to them, and direct payment from them brings the transactions under these 10 contracts within the oft-cited *W. Tip Davis Co.* v. *Patterson, supra*. Superficially, there is a resemblance but the basic distinction still remains that the procurement in question in that case originated with the individual exchange without any underlying War Department contract. Here all orders were pursuant to terms and conditions negotiated by petitioner and the War or Navy

---

[4] Letter B–121926, Mar. 21, 1955, to chairman of the Senate Small Business Committee.

Departments. In the *Davis* case, mention is made (quoting from *Standard Oil Co. of California* v. *Johnson*, 316 U. S. 781) that the Government assumed "none of the financial obligations of the exchange." In the instant case, however, no adequate reason is presented for holding that the United States Government was not liable on the 10 contracts now being considered.. The regulations issued pursuant to the Renegotiation Act, section 332.6 [5] (as amended Rev. 11, Oct. 26, 1944), provide for this result and we cannot hold that this regulation is an unreasonable or improper administrative interpretation of the statute. Cf. *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294.

Alternatively, petitioner argues that the contracts between petitioner and the Departments were really subcontracts, the actual contracts being between governmental Departments. This is intended to bring these documents under the provisions of section 403 (i) (1).[6] On both failure of proof and a misapplication of the statute, this argument must be dismissed.

We must hold that sales under the 10 documents classified by petitioner as "open-end price agreements" are within the scope of the Renegotiation Act.

The other 4 "open-end agreements" were assigned by the Quartermaster General, acting for the War Department, to the Army Exchange Service. The parties agree that sales from these contracts are not to be renegotiated, but for different reasons. Respondent contends that administrative action has exempted such sales, while petitioner maintains that such sales are not subject to the Renegotiation Act. The controversy is due to section 403 (c) (6) which establishes a $500,000 floor for renegotiable sales to warrant determination of any excesssive profits. In computing such floor, sales exempted by administrative action are to be included, while those not subject to the Renegotiation Act are, of course, excluded.

Petitioner contends that sales under these last 4 contracts fall within the ambit of *W. Tip Davis Co.* v. *Patterson, supra.* On this point its contention appears valid. Some distinction might be found between the Army Exchange Service and the individual exchanges involved in the *Davis* case. However, respondent does not pursue this point and it apparently treats the Service in the same manner as an individual exchange.

---

[5] SEC. 332.6. *Army Post Exchange and Army Exchange Service Contracts.*

Contracts with Army Post Exchanges or with the Army Exchange Service are not subject to statutory renegotiations. Contracts entered into by the Quartermaster Corps are War Department contracts and are subject to renegotiation even though some or all of the articles contracted for are intended to be and are assigned to or resold to an Army Post Exchange or the Army Exchange Service.

[6] SEC. 403 (i) (1). The provisions of this section shall not apply to—

(A) any contract by a Department with any other department, bureau, agency, or governmental corporation of the United States * * *

Each of the 4 documents now being considered contains language printed over the renegotiation clause specifically stating that the parties understand and intend that the contract is not "subject to renegotiation,"[7] as well as stamped language on the face that the contracts are "for use of Army Exchange Service or its nominee" under identified War Department circulars, and that appropriated funds are "not used" or "involved" in this purchase. The "special contract provisions" allow assignment [7a] of these contracts to specific arms or branches of the service, including the Army Exchange Service. These considerations, together with the total absence of any indicated action by the War Contracts Price Adjustment Board or any other administrative body, indicate that these contracts were direct obligations of the Army Exchange Service not subject to renegotiation. We find no basis for the view that the exemption of sales under the 4 contracts now in question resulted from administrative action.

We must, on considering the evidence, reject respondent's contention as to these 4 documents and hold that sales under them are not to be considered in computing the floor prescribed by section 403 (c) (6).

In petitioner's fiscal year ended June 30, 1946, exclusion of the sales under the 4 contracts assigned to the Army Exchange Service reduces sales to the Government below $354,000. Although this amount obviously is less than the statutory floor, respondent still contends that those sales are renegotiable. It reasons that since section 403 (c) (6) provides that a fiscal year shorter than 12 months results in a proportionately reduced floor, and since section 403 (h)[8] excludes sales after the termination date of the Renegotiation Act, December 31, 1945, that the floor ought to be reduced by one-half.

Respondent's action reflects its interpretation of the statutory purpose behind section 403 (c) (6) and an analogy to *Glenfield Machine & Tool Co.* v. *W. C. P. A. B.*, 16 T. C. 27, and *Rosner* v. *W. C. P. A. B.*, 17 T. C. 445, 458. Neither case involves this point, *Glenfield* being concerned with fiscal years of less than 12 months, see also *Callahan* v. *War Contracts Price Adjst. Board*, 13 T. C. 355, while the *Rosner* case involved consideration of the time that income accrues in relation to the termination date. The only pertinent matter that these cases

---

[7] The overprinting then cites an opinion by the Judge Advocate General to that effect. That same opinion is cited in the *Davis* case, 12 T. C. 335.

[7a] On one of these 4 contracts, the assignment provisions are deleted, but both parties treat it as carrying the same obligations as the other 3.

[8] SEC. 403 (h). This section shall apply only with respect to profits derived from contracts with the Departments and subcontracts which are determined under regulations prescribed by the Board to be reasonably allocable to performance prior to the close of the termination date. * * * For the purposes of this subsection, the term "termination date" means whichever of the following dates first occurs—

(1) December 31, 1945 * * *

establish would be to confirm the clear language of section 403 (c) (6) that the contractor's fiscal year, determined pursuant to section 48 (a), I. R. C. 1939, shall be determinative under the Renegotiation Act.

Respondent here, in effect, divides petitioner's 12-month fiscal year into two 6-month fiscal periods. The statute (and the regulations for that matter) in no way justifies such action and we do not agree with respondent's contention that its view is clearly reflective of the statutory purpose.

Petitioner resists respondent's action on the further ground that the determination of the Board involved the entire fiscal year and that this Court lacks jurisdiction except over those periods for which excessive profits were determined by the Board. As respondent's action would alter the fiscal period, petitioner's argument has some validity.

We hold that reduction of the $500,000 floor for petitioner's fiscal year ended June 30, 1946, by one-half is incorrect and must be rejected. As section 403 (c) (6) provides that no determination of excessive profits will be made if the floor is not exceeded, we disallow respondent's determination respecting petitioner's fiscal year ended June 30, 1946.

For the fiscal year ended June 30, 1945, we have held that petitioner had renegotiable sales in excess of $500,000. Petitioner argues that profits on those sales were not excessive. Based on the same statistics, both parties compute the ratio of petitioner's profits to renegotiable sales after respondent's determination. Although the same figures are used, petitioner computes a ratio of 6.59 per cent, while respondent computes a 19 per cent ratio. Both approaches weight the ratios erroneously. Petitioner neglects to reduce the amount of sales by the excessive profits to be recouped by the Government. Respondent assumes that all but one of petitioner's other operations produced no profit or loss and adds back an estimated loss from that one.

As there is no basis for allocating cost to renegotiable sales, petitioner's entire operations must be considered in determining excess profits. In the fiscal year involved, its sales totaled $1,187,836, while it accrued profits of $354,713, a ratio of about 30 per cent. Eliminating the determined excessive profits of $230,000 from both operating profits and sales reduces the profits ratio to about 13 per cent. Although petitioner's other operations might have produced such profits and sales as to alter the ratio of profits actually derived from renegotiable sales, petitioner has failed to present such proof. As petitioner has the burden of proof it must suffer from any evidentiary weakness.

Petitioner complains that respondent has not considered the factors listed in section 403 (a) (4) (A)[9] which might warrant retention of additional profits. However, petitioner produces no evidence that any profits were specifically attributable to any of these factors and certainly produces no evidence to indicate the amount attributable to such factors. During the entire period 1936 through 1944 petitioner's operating profits varied widely but roughly averaged 10 per cent. The determination here results in a retained profit of 13 per cent of sales rather than the 10 per cent which petitioner could justifiably claim as its normal operating rate. Thus, in effect, petitioner would retain 3 per cent of its sales to accommodate any such factor that might be present. In the absence of proof of a more appropriate amount, we must conclude that respondent's allowance is adequate. See *Neils Schultz*, 44 B. T. A. 146, 151, distinguishing *Cohan* v. *Commissioner*, 39 F. 2d 540.

For petitioner's fiscal year ended June 30, 1945, we conclude, on the evidence presented, that respondent's determination of excessive profits of $230,000 is appropriate.

As to petitioner's subsidiary, Bloomington, little direct evidence or argument has been presented by either party. Respondent included receipts by Bloomington in its computation of petitioner's floor. As Bloomington clearly derived its income solely from receipts from petitioner, respondent's treatment duplicates the receipts. Although section 403 (c) (6) requires aggregation of amounts received by persons under common control, that provision was obviously intended to prevent division of a contractor's business into several operating units for purposes of avoiding renegotiation by obtaining several floors. Bloomington did not deal with the Government directly and had no receipts from anyone except petitioner. We must reject respondent's inclusion of Bloomington's receipts in computing the floor for petitioner.

As for Bloomington's floor, we view section 403 (c) (6) as requiring consideration of the receipts received by Bloomington and others under common control during Bloomington's fiscal year January 9 through December 31, 1945. From July 1 through December 31,

---

[9] Sec. 403 (a). For the purposes of this section—

\* \* \* \* \* \* \*

(4) (A) \* \* \* In determining excessive profits there shall be taken into consideration the following factors:

    (i) efficiency of contractor \* \* \*
    (ii) reasonableness of costs and profits \* \* \*
    (iii) amount and source of public and private capital employed and net worth;
    (iv) extent of risk assumed \* \* \*
    (v) nature and extent of contribution to the war effort \* \* \*
    (vi) character of business \* \* \*
    (vii) such other factors the consideration of which the public interest and fair and equitable dealing may require \* \* \*

1945, Park Sherman realized renegotiable receipts of more than $353,000. During Park Sherman's fiscal year ended June 30, 1945, it received $867,000 of renegotiable receipts. There is no evidence as to the proper allocation to the period January 9 through June 30, 1945. Petitioner, who has the burden of proof, is responsible for the lack of evidence. The only basis in the record on which we might determine the amounts allocable to the period January 9 through June 30, 1945, is ratably, resulting in a sum in excess of $400,000 for that period alone, which would bring the aggregate of renegotiable sales for Bloomington's fiscal year January 9 through December 31, 1945, well over the $500,000 floor.

As to the excessive profits determined, petitioner presents no evidence whatever to refute respondent's determination. For failure of proof, we necessarily sustain respondent's determination as to Bloomington.

Because of the possibility of minor adjustments indicated by the stipulation of facts filed herein,

*Decisions will be entered under Rule 50.*