MORRIS ROSNER, PETITIONER, *v.* WAR CONTRACTS PRICE ADJUSTMENT BOARD, RESPONDENT.

Docket No. 781–R. Promulgated September 27, 1951.

446

*Dana Latham*, *Esq.*, and *Richard S. Doyle*, *Esq.*, for the petitioner. *James Lynch*, *Esq.*, and *J. F. Wolf*, *Esq.*, for the respondent.

450

451

### OPINION.

DISNEY, *Judge:* An issue preliminary to the question of excessive profits, if any, is whether the amount included in renegotiable income for the fiscal year ended December 31, 1945, for amounts accrued by Whitin at the close of 1943 and 1944 are subject to renegotiation. Petitioner's contention, in general, is that the amounts accrued— $119,033 at the close of 1943 and $43,715 at the close of 1944—were subjected to renegotiation for those years and may not again be renegotiated. Respondent's answer to the contentions of petitioner is based, first, upon the theory that petitioner was on the cash basis of accounting for income tax purposes. Petitioner not only insists that there is no proof in the record before us that he reported by the cash method but that assuming the fact, the Board had power to and did renegotiate the amounts in 1943 and 1944.

Petitioner declared in his 1943 return that it was prepared on the cash basis. This constitutes an admission of that fact. No evidence was offered to show that petitioner ever made application to the Commissioner for a change in that method of reporting income. Nothing appears in the returns for 1944 and 1945 to indicate that they were prepared on a basis other than cash. Cash was shown in the bilateral renegotiation agreement for 1943 as petitioner's basis and nothing other than amounts received appears in the statement petitioner made to the Board of renegotiable income in 1944, which statement the

Board found to be in accordance with his return for that year. The evidence is sufficient in our opinion to establish that petitioner was on the cash basis. In any event, without any evidence on the question we could assume that petitioner operated on that basis. *Stanley C. Warrick*, 20 B. T. A. 220.

Section 403 (a) (4) (B) of the Renegotiation Act of 1943 provides that:

The term "profits derived from contracts with the Departments and subcontracts" means the excess of the amount received or accrued under such contracts and subcontracts over the costs paid or incurred with respect thereto. Such costs shall be determined in accordance with the method of cost accounting regularly employed by the contractor in keeping his books, * * *

It is provided in section 403 (a) (9) that:

The terms "received or accrued" and "paid or incurred" shall be construed according to the method of accounting employed by the contractor or subcontractor in keeping his books.

These statutory provisions must be construed in the light of other provisions of the Act, permitting inclusion by consent in renegotiable income of amounts not otherwise includible.

Section 403 (c) (1) says that at the conference held with respect to renegotiation:

* * * the Board shall endeavor to make a final or other agreement with the contractor or subcontractor with respect to the elimination of excessive profits received or accrued, and with respect to such other matters related thereto as the Board deems advisable. Any such agreement, if made, may, with the consent of the contractor or subcontractor, also include provisions with respect to the elimination of excessive profits likely to be received or accrued. * * *

Another provision of the Act provides that:

For the purpose of this section the board may make final or other agreements with a contractor or subcontractor for the elimination of excessive profits and for the discharge of any liability for excessive profits under this section. Such agreements may contain such terms and conditions as the Board deems advisable. * * * [Section 403 (c) (4)]

Regulations promulgated under the Act provide that:

* * * Under ordinary circumstances a contractor will be renegotiated on the same basis as that used for the determination of his income for Federal income tax purposes * * * [Article 302]

Petitioner construes these statutory provisions to mean that the Board had power to subject to renegotiation for 1943 and 1944 by agreement with him the accruals made by Whitin at the close of those years and argues that the whole of the amounts were actually renegotiated and settled. We agree with him on his interpretation of the statute, that is, that the Board could agree with him on these matters, but for reasons to be set forth disagree with his conclusion on the scope and finality of the renegotiation proceedings each year and con-

clude that they did not in fact agree to the extent he argues. First we will consider the proceedings held for the year 1943.

Petitioner and respondent agree that of the $119,033 [2] accrued by Whitin at the close of 1943, $54,372 was renegotiated by the bilateral agreement executed on July 6, 1945. The controversy in this respect concerns $64,661, the remainder of the $119,033, which $64,661 petitioner contends was renegotiated and settled for that year, though not eliminated.

As already pointed out, the statute contained authority for renegotiation of the entire amount by agreement and the proof here is that members of the Board were aware of the statutory authority. The turning point is whether the power to renegotiate by agreement was exercised by the parties concerned, above the $54,372, out of the $119,033. A conclusion on the point requires us to resolve a conflict in the evidence.

Petitioner's position on brief is that the evidence establishes that the amount of $64,661 represents an allowance made by the Board out of the accrual to compensate him for absence of security for the liability of Whitin to pay the amount, for lack of provisions for payment of interest thereon, and for impossibility to compute his tax credit. Petitioner testified that the amount represents an allowance for such reasons. A member of the Board, William F. Delafield, testified that the amount of $54,372 was computed solely on orders outstanding on June 30, 1943 (when, in effect, the contract was amended) and considering deliveries made. There were logical grounds for an agreement to include only so much of the accrual as represented orders obtained before and outstanding on June 30, 1943, as were delivered during the remainder of 1943. Under the agreement of January 2, 1942, petitioner earned his commission upon the acceptance of the order by Whitin and the amount was payable in the year in which delivery was made under the order. Accordingly, without amendment of that contract, commissions on deliveries made at any time during 1943 on orders outstanding June 30, 1943, were payable within that year. This contractual right to commissions petitioner surrendered on July 1, 1943, in favor of payment only after delivered material was paid for, and then in ten equal annual installments.

Petitioner having, by the amendment of July 1, 1943, deferred until after 1943 a contractual right to receive payment in 1943, there was ground for treatment of the amount in the renegotiation agreement as having been constructively received. Delafield testified that the theory of constructive receipt by petitioner was the basis for the computation. The petitioner contends in effect that Delafield's computa-

---

[2] The amount is reflected in the 1945 proceedings as $119,034 because of a different method employed in rounding dollars.

tion is meaningless. The testimony as transcribed is somewhat ambiguous but it is clear, nevertheless, that thereunder the $54,372 was based upon consideration of the amount of contracts outstanding on June 30, 1943, together with consideration of deliveries made, and therefore not upon mere allowance of $64,661 for the reasons advanced by the petitioner. After consideration of all of the evidence we have accepted the testimony of Delafield as proof of the manner in which the figure $54,372 was reached.

Petitioner also relies on testimony of W. L. Hudson, Chief of the Board during the renegotiation proceedings, that the entire amount was subjected to renegotiation.. Hudson testified that "we were of the opinion that we had the right to include in the moneys we were dealing with * * *" the amounts payment of which petitioner deferred, and then stated that the Board did include them. However, other testimony by him on the point is that the Board recognized difficulty in supporting a view that it had undisputed control over the entire amount, that he could not recall the portion thereof over which jurisdiction was exercised but that it was some part of it and, further, could not recall the reason for not renegotiating all of the amount. This testimony, by Hudson, considered as a whole, is to the effect that the entire amount was not renegotiated.

That the Board intended the proceedings for 1943 to renegotiate all of the $119,033 and to be a final settlement is alleged by petitioner to find support also in other testimony of Hudson. Hudson testified that at the time he concluded renegotiations for 1943 and 1944 he did not have in mind any plan to attempt to reach any part of the accruals in a subsequent year. This testimony however is not only limited to the thought of one member of the Board but must be considered in the light of other testimony by him already referred to, and other evidence on the question. Reliance is also placed by petitioner on his own testimony to the effect that when he agreed to enter into the bilateral agreement for 1943, he was assured by the members of the Board at the meeting, including Hudson, that the $40,000 agreed to as excessive profits included the accruals by Whitin and that if he would sign the agreement, clearance would be given him for 1944, which was done. Hudson, petitioner's witness, was not questioned by petitioner's counsel as to the alleged assurance. On cross-examination he testified that he made no oral agreement with petitioner on the effect execution of the bilateral agreement for 1943 would have on renegotiation for subsequent years, that he knew of no written agreement to that effect and that the policy was not to make agreements of that kind.

Petitioner's idea that all of the amounts earned by him in 1943 and 1944 though not received were renegotiated in the proceedings in

1945 is in our view contrary to the language of the Renegotiation Agreement of July 6, 1945. That instrument is on a printed form, with certain blanks left to be filled. One of these blanks is found in the provision stating that $40,000 of "profits received" should be eliminated. "Received" is in typewriting, filling a blank. The same is true in the provision discharging the petitioner from further liability for there again the liability discharged is for "profits *received*," the word "received" being in typewriting, filling a blank. (Emphasis added.) The statute, section 403 (c) (1), provides for agreements, final or otherwise, with respect to elimination of excessive profits, received or accrued and, with the consent of the contractor or subcontractor, for provisions with respect to excessive profits "likely to be received or accrued." It seems obvious therefore that the printed form of Renegotiation Agreement, used in this case, contained the blanks above mentioned for the express purpose of designating in conformity with section 403 (c) (1) whether the excess profits to be eliminated had been "received," or "accrued," or "likely to be received," or "likely to be accrued." It seems apparent therefore that if petitioner's idea, that all of the $119,033 for 1943 was renegotiated, though not yet received, and to be received over a period of years, the blanks described would have been filled in not with "received" but with "likely to be received," in accordance with section 403 (c) (1). The agreement here clearly specified elimination of amounts "received"; and is in entire consonance with the cash basis stated in the agreement.

Also, opposed to the idea of an assurance, understanding or agreement that the bilateral agreement was a final settlement of the entire amount of $119,033 is the method employed in determining the net amount of renegotiable income. The operating statement attached to the bilateral agreement discloses renegotiable income of $117,311. The parties agreed at the hearing that this figure was arrived at by deducting from total renegotiable income of $181,971 (which includes the $119,033 for accruals made by Whitin at the close of 1943) the amount of $64,661. Such subtraction ($119,033 minus $64,661) had the effect of leaving $54,372 of the accruals in renegotiable income and excluding therefrom $64,661. The agreement by petitioner in that regard is opposed to his present contention that the $64,661 was renegotiated in 1943. To remove any doubt there might be about how much of the $119,033 was included for renegotiation, there was inserted in the operating statement, which was made a part of the agreement, a footnote, signed by petitioner, that petitioner had agreed to treat the amount of $54,372 as income in 1943 for renegotiation purposes. Thus it appears that not only is the renegotiation for 1943 based upon agreement, but that the agreement was limited in amount

to $54,372. Petitioner was careful in this matter for he not only limited the amount, but limited the agreement to "renegotiation purposes alone and not for any other purpose." It seems apparent that if the intention was to renegotiate and settle the entire amount, and not merely $54,372, a different course of action would have been followed. Lack of any such intention is further indicated by the absence of a final settlement the next day for the year 1944. The letter of cancellation of the renegotiation proceedings for 1944 specifically recited that the cancellation did not operate as a release of liability, though reciting that in the absence of new developments no further action was contemplated. This is contradiction of petitioner's testimony that, as to both years, in effect he was assured that the $40,000 payment made by him for 1943 freed him from being subject to renegotiation in the future for either 1943 or 1944. The letter of cancellation appears also to be explanatory of Hudson's testimony relied upon by petitioner, as above noted, in effect, that on July 6, 1945, he did not have in mind any further proceedings against petitioner. Since, under the evidence, he participated in the renegotiation for both 1943 and 1944 and was during most of 1945 chief of the section, which issued the cancellation letter as to 1944 on July 6, 1945, which specifically stated that "Although such cancellation does not operate as a release of liability   *   *   *   in the absence of new developments. no further action is contemplated," it seems reasonable to think that that is all he had in mind as to either year—that is, that although he did not have in mind attempting to reach the accruals in any subsequent year, there was no release of liability as to either year. It will be noted in this connection that section 403 (c) (1) provides "final or other agreement with the contractor" so that there is no presumption that the agreement was final.

From a consideration of all of the evidence we conclude that the amount of $64,661 was not renegotiated for the year 1943 and that the bilateral agreement was not a final settlement as to that amount.

Petitioner's position with respect to the year 1944 is, in substance, that the amount of $43,715 was subjected to renegotiation in that year because the Board was aware that the income had been earned during the year, and had authority to include the amount in renegotiable income, canceled proceedings for that year, and did not intend again to seek to renegotiate the commissions or any part thereof in any future year.

While petitioner's liability for excessive profits in 1944 was considered at the time the renegotiation proceedings were being conducted for 1943, the proof here is that he was renegotiated on a cash basis of accounting in accordance with the statement of income submitted to the Board by petitioner, and his gross renegotiable income under that

method of accounting for renegotiation and tax purposes having been found to be less than the statutory minimum, a cancellation letter was sent to petitioner. Accordingly, no part of the accrued commissions was included in renegotiable gross income. Petitioner argues that the whole amount was considered, and renegotiated, but that renegotiable income was regarded as less than $25,000 by reason of the possibility of no collection, and lack of interest, upon the deferred amounts. We think it clear that the fact that the amounts reported by him, on a cash basis, were less than $25,000, and not the above reasons suggested by petitioner, caused the cancellation as to 1944. No bilateral agreement was executed for 1944, as there was for 1943, and the cancellation letter was (as it specifically says) not a release of liability under the statute. It is apparent and we hold that no part of the $43,715 was subjected to renegotiation in 1944.

The excessive profits in controversy were determined by the respondent under the provisions of section 403 (h), as amended June 30, 1945, which is set forth in the margin.[3] The parties are in agreement that the "termination date" under the language of the statute is December 31, 1945. Petitioner's next contention, in substance, is that the statute does not authorize renegotiation for the fiscal year 1945 of profits earned by and accrued by Whitin to him in 1943 and 1944. He regards the provisions of section 403 (h) as relating to renegotiation of profits to be received or accrued after the termination date and which could not previously have been subjected to renegotiation, and contends that if they confer power to reach the accruals here involved, the statute should have been applied in the 1943 and 1944 proceedings. The amounts subjected to renegotiation for the year 1945 were earned by petitioner in 1943 and 1944. The crux of our next question is therefore whether section 403 (h), as amended, authorizes renegotiation in 1945 of the amounts so earned in 1943 and 1944 but not to be received until after the termination date, December 31, 1945.

Section 403 (h), as amended, must be construed in connection with other provisions of the statute to arrive at its meaning. As hereinbefore pointed out and held, petitioner was on the cash basis of reporting income for income tax purposes and, except for the inclusion, by agreement, of $54,372 of income considered constructive in 1943, petitioner was renegotiated in 1943 and 1944 on the cash basis. Only on the theory of constructive receipt or by agreement could the $54,372,

---

[3] (h) This section shall apply only with respect to profits derived from contracts with the Departments and subcontracts which are determined under regulations prescribed by the Board to be reasonably allocable to performance prior to the close of the termination date. Notwithstanding the method of accounting employed by the contractor in keeping his books, profits determined to be so allocable shall be considered as having been received or accrued not later than the termination date. * * *

earned but not yet received, nor accrued by petitioner, have been included in renegotiable income. Section 403 (c) (1) and (4). Without petitioner's consent the Board would in the proceedings taken in 1945 for 1943 and 1944 have been required to confine renegotiable income to such cash or constructively cash receipts (in the absence of accrual by him). Sections 403 (a) (4) (B) and 403 (a) (9), providing renegotiation of profits "received or accrued." In spite of the broad provisions of section 403 (h), as amended, we find nothing therein or in its legislative history as an aid in its construction, authorizing its application in renegotiation proceedings for the fiscal years 1943 and 1944. There was agreement, under other provisions, to renegotiate a portion of the amounts in 1943 and action by both parties which limited renegotiable income in 1944 to actual receipts. Under section 403 (c) (1) the agreement in 1945, for 1943 could be a "final or other agreement," so that it does not preclude the later action under 403 (h). None of the amounts here involved was treated as renegotiable income in 1943 or 1944. It should be noted particularly that no amount payable or paid in 1944 is included in this proceeding. Renegotiation for that year was canceled.

Section 403 (h) applies only to profits "reasonably allocable to performance prior to the close of the termination date." The "performance" here was in 1943 and 1944 and petitioner had profits therefrom, payment of which was, by his agreement, deferred and to be paid in equal annual installments over a period of 10 years. Allocation of profits so deferred, to the first and only fiscal year the section was to operate, was, under the circumstances, a reasonable allocation. That the amounts were not received, actually or constructively, in 1945 is not decisive, for the provision requires the Board to treat them as renegotiable income not later than the "termination date" December 31, 1945, regardless of the contractor's method of accounting. Thus, without the action taken by respondent the amounts would have escaped renegotiation, a result obviously not contemplated by the statute, especially in a case like this one where the contractor voluntarily postponed payment of a large portion of his profits to years subsequent to the termination date.

Any doubt there may be on the applicability of the section to the facts here is cleared by the legislative history of the provision. Its predecessor read, to the extent material, as follows:

SEC. 403 (h). This section shall apply only with respect to profits derived from contracts with the Departments and subcontracts which are attributable to performance prior to the termination date. For the purposes of this subsection—

(1) The profits derived from any contract with a Department or subcontract which shall be deemed "attributable to performance prior to the termination date" shall be—

(A) in the case of any contract or subcontract the performance of which requires more than twelve months, or in the case of any contract or subcontract with respect to which the powers of the Board are exercised separately pursuant to subsection (c) (1) rather than on a fiscal-year basis, the portion of the profits so derived which is determined by the Board to be equal to the same percentage of the total profits so derived as the percentage of completion of the contract prior to the termination date; and

(B) in all other cases, the profits so derived which are received or accrued prior to the termination date; * * *

* * * * * * *

The termination date of December 31, 1944, fixed therein, was by proclamation of the President extended to June 30, 1945, the latest possible date under the Act. Thus, without extension by Congress the life of the Renegotiation Act of 1943 would have expired June 30, 1945. The amendment on that date extended its existence six additional months.

The Committee on Ways and Means in its Report No. 725 on the bill said that ordinarily the existing law was applicable to profits received or accrued. Here petitioner did not receive or accrue in 1943 or 1944 any of the amounts here involved, for renegotiation purposes. The report then goes on to say that the amendment extends the Act to profits "reasonably allocable to performance prior to the termination date."

A statement of the Chairman of the War Contracts Price Adjustment Board was attached to the report of the committee, as containing a more complete report with reasons for the change in the Act. The statement discloses concern over a plan to terminate the applicability of the Act in such a way as to protect the interests of the Government and at the same time accord fair and equitable treatment to the contractor. The action taken here by the respondent is in line with that intent. The Board had not renegotiated the amounts in question. By subjecting them to renegotiation in 1945, respondent protected the interests of the Government and did not thereby increase the liability of petitioner for excessive profits, particularly in view of action the petitioner took in 1943 to defer payment beyond the termination date. Whether the method was adopted by him in an effort to bring his renegotiable income each year under the statutory minimum of $25,000 we need not decide. The agreement did have that effect and petitioner being on the cash basis of accounting, without his consent, and the June 30, 1945, amendment, the Board could not have renegotiated the profits. The amounts involved were not received, either actually or constructively, nor accrued, by petitioner in 1945.

The statement by the Chairman refers to administrative problems in connection with accounting methods, if a specific date, as was done, was used to terminate the Act. Petitioner's cash method of accounting was not unusual, but he having voluntarily postponed payment to

years beyond the termination date after he had earned the income, the situation created by him made his method of accounting unusual for renegotiation purposes.

Another idea expressed in the statement is that the interests of both the Government and the contractor "will be best served if the language of the bill gives a degree of flexibility in the handling of this situation." The Senate Finance Committee report states that "* * * this amendment confers upon the Board broad discretionary power in determining items of income which fall within the scope of the act * * *." The position in which petitioner placed himself required a statute in broad terms, as was enacted, to reach profits which petitioner, by his voluntary acts, had placed beyond the power of the Board to renegotiate without his consent. We think this case is within the broad discretionary power granted by the Act.

In conclusion we hold that under the circumstances prevailing here the amounts involved are reasonably allocable to the fiscal year ended December 31, 1945, and, therefore, constitute profits subject to renegotiation in that year, within section 403 (h).

Petitioner contends also that renegotiation of the profits in 1945 was barred by the statute of limitations provided in section 403 (c) (3) of the Act. His theory, as we understand it, is that the amounts having been earned by and accrued to him in the respective years 1943 and 1944, the renegotiation proceedings here involved could not be commenced as to each year later than 1 year after the close thereof. The section relied upon provides, in substance to the extent material here, that if no proceedings are commenced within 1 year after the close of the year in which the excessive profits are received or accrued, all liability of the contractor is discharged and that agreements or orders determining excessive profits must be made within 1 year after the commencement of proceedings. Provision is made in the statute for non-application of the 1-year limitation period for review of orders by the Board and by agreement of the parties.

The amounts in question, as already pointed out, though earned in 1943 and 1944, were not received, or accrued, by petitioner in those years for renegotiation purposes. Section 403 (h), as amended, for the first time empowered the respondent, without the consent of petitioner, to treat the amounts as received by petitioner for renegotiation purposes. Obviously, such amounts were includible only after the amendment and then were allocated, and properly so, to 1945. As above noted, no amounts received in 1944 are involved. In addition petitioner has not shown the time when renegotiation proceedings for 1945 were commenced or that he did not agree to an extension of the 1-year period and does not contend that the proceeding was not started within 1 year from the close of 1945. Under the circumstances we

can not find that the proceedings were not commenced or that the order in question was not made within the time allowed by the statute.

In addition to the contention of petitioner that no part of the accruals of $64,661 and $43,715 at the close of 1943 and 1944 constitute renegotiable income in 1945, on which we have above ruled against him, he argues that none of the items of cash receipts in 1945, totaling $28,433.88, is renegotiable or subject to the Act. The amount consists of three items, $12,000, $16,275, and $159 which we will treat separately.

The parties are in agreement that the question of whether the item of $12,000, which was received from Whitin under the contract of June 2, 1941, constitutes renegotiable income is controlled by the provisions of section 403 (a) (5) (B) (ii) of the Act, which defines a subcontract as an agreement "under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract or contracts with a Department or a subcontract or subcontracts * * *." The contract appointed petitioner as the "accredited agent" for Whitin in Washington without specifying in writing the duties of the agency.

Petitioner had an understanding with Whitin at the time of the appointment of June 2, 1941, concerning the nature of his duties, which are set forth in our findings. The duties did not include solicitation or procurement of contracts with any department of the Government or subcontracts. The later agreement of January 2, 1942, was entered into for payment of commission on orders obtained for his employer. Although it does recite that the 1 per cent there provided is to be paid as commission for obtaining orders "and for the work you are doing for us in connection with the U. S. Maritime Commission and all other departmental work for which we avail ourselves of your services * * *," the $12,000 was actually paid, in addition to the 1 per cent and was due under the provisions of the agreement of June 2, 1941, which did not, under the evidence, provide for solicitation, procurement or attempt to procure contracts or subcontracts. Accordingly, we hold that the amount of $12,000 does not constitute renegotiable income in 1945.

The amount of $16,275 represents payments received in 1945 for installments payable in that year out of the commissions accrued at the close of 1943 and 1944. For the reasons given in connection with the amounts payable after 1945, the amount constitutes renegotiable income reasonably allocable to 1945 under the provisions of section 403 (h), as amended.

The amount of $159 representing a refund on a railroad ticket, the cost of which was deducted by petitioner as an expense in his return for 1945, does not constitute renegotiable income, it being nothing more than recovery of an expenditure made by petitioner in carrying out a

business activity, the nature of which was not the subject of any evidence before us. Accordingly, the amount will not be regarded as renegotiable income in 1945.

There remains the question of to what extent, if any, the renegotiable income as reduced by us constitutes excessive profits. On this issue, petitioner had the burden of proof. *Nathan Cohen*, 7 T. C. 1002. We have determined the amount of renegotiable income, leaving still for consideration under the issue, the amount of costs to be allowed and the factors prescribed by section 403 (a) (4) (A) of the Renegotiation Act.

Petitioner says that respondent allowed no amount for expenses incurred in the earning of the income in 1943 and 1944 which was allocated to 1945, and that he had $14,477.35 of the expenses for renegotiable business in 1945.

No proof was made by petitioner that the allowance for costs made by the Board in 1945 for the year 1943 was not for all of the renegotiable business conducted by him in that year, including the $64,661 of income not subjected to renegotiation in that year. As to 1944: The present proceeding does not seek to include renegotiable income for 1944. The proceeding for that year was canceled, and the amounts of renegotiable income received in that year are excluded here. Specific statutory authority would be required to authorize deduction of expenses incurred in 1944 against profits allocable to 1945, and we find none. Moreover, no reason appears for doing so since we see the income for 1944 not involved in, but specially excluded from, the proceeding. The expenses of 1944 logically are applicable only to the income of that year, as to which renegotiation was canceled. Items of cost allowed in a prior renegotiation may not, under regulations of the War Contracts Price Adjustment Board, be allocated to a subsequent year. Article 381.4 (5). The regulation is reasonable when applied to the facts here.

For 1945 the War Contracts Board allocated petitioner's expenses in the ratio that renegotiable income actually received bore to non-renegotiable income and by that method it allowed $13,823 or about seven-twelfths, of the costs of $23,600 for renegotiable business. Respondent does not request that costs be reduced below that amount. If the $12,000 petitioner received under the June 2, 1941, contract had been held by the War Contracts Board to be non-renegotiable income, as we have held, the same method of allocation would have resulted in an allowance of only about $10,500.

Petitioner testified that of his expenses in 1945, amounting to $23,600.18, substantially all of which consists of compensation to three employees, traveling expenses, entertaining clients, and costs of maintaining two offices, one in Washington and the other in New York City,

$14,477.35 is allocable to renegotiable business, excluding his duties under the June 2, 1941, contract. The testimony represents conclusions of the witness, which the whole evidence shows to be unjustified.

Petitioner testified that during the first 6 months most of his time was devoted to work required by the June 2, 1941, contract and that he could no more than guess what he did during the remainder of the year. He asserts, on brief, that his principal activities for Whitin in 1945 related to matters other than the solicitation of contracts or subcontracts. All of his traveling expenses, amounting to $3,192.95, were included in renegotiable costs, leaving nothing for the June 2, 1941, contract or duties as an employee of Metro-Goldwyn-Mayer Studios. All of the expense of his Washington office, amounting to $2,673.98, and $1,882.60 of the cost of $2,227.63 incurred in maintaining the New York City office, was also allocated to renegotiable business. He endeavored to obtain orders in 1945 under his contract but the evidence fails to show that the effort was made throughout the year. The evidence, in our opinion, is insufficient to find that the petitioner's costs were $14,477.35, as alleged by him, or in excess of $13,823, and we so hold.

Petitioner next contends that the unpaid amounts of the accruals made at the close of 1943 and 1944 should be discounted under section 403 (a) (4) (A) (iv) and (vii) because the deferred payments do not bear interest and that being unsecured there is no certainty that they will ever be paid and that it will be difficult, if not impossible, to compute his tax credit. No amount is requested or suggested as a reasonable amount and no evidence was offered on the point.

As already pointed out petitioner's right to payment upon delivery of the articles covered by the orders was surrendered in favor of payments in equal annual installments over a period of 10 years without security or interest. Petitioner must have regarded the deferred payment plan to be of greater economic value to him than the one it superseded, otherwise he would not have voluntarily changed the method of payment. We can not find that those advantages, even without knowledge of their character, do not offset or more than outweigh any loss for interest or risk of ultimate payment. Nothing appears in the evidence before us that the debt will not be paid on maturity.

The jurisdiction of this Court is limited to the redetermination of excessive profits. Section 403 (e) (1) and (2); *Psaty & Fuhrman, Inc.,* 11 T. C. 638. Credits for income taxes are allowed by the Secretary in the elimination of excessive profits under directions of the Board after this Court enters its order. Section 403 (c) (2). Accordingly, petitioner's tax credit, if any, or even impossibility to compute any to which he may be entitled, is not a factor for consideration in determining excessive profits.

Some proof was made that petitioner contributed to the war effort. That factor, together with all other facts having any bearing on the issue, has been considered in reaching our ultimate finding that petitioner received excessive profits in the fiscal year ended December 31, 1945, in the amount of $48,000.

Reviewed by the Court.

*An order will be issued accordingly.*