HOOPER CONSTRUCTION COMPANY, A CORPORATION, PETITIONER, *v.* RENEGOTIATION BOARD, RESPONDENT.

Docket No. 951–R. Filed February 28, 1961.

*Robert P. Smith, Esq.,* and *Joseph W. Kiernan, Esq.,* for the petitioner.

*Andrew P. Vance, Esq.,* for the respondent.

SCOTT, *Judge:* In its unilateral order the respondent determined, under the Renegotiation Act of 1951, as amended or supplemented, that the petitioner realized excessive profits in the amount of $80,000 from contracts and subcontracts subject to said Act for its fiscal year ended December 31, 1952.

Petitioner contends that respondent erroneously included as income subject to renegotiation for the year 1952 amounts received from Government contracts which were completed prior to January 1, 1952, and under petitioner's accounting methods subject to renegotiation only for the year 1951.

Pursuant to a motion made by respondent, the issues for decision in this case were limited by order of this Court, dated February 19, 1959, to the issues of whether petitioner had income in the fiscal year ended December 31, 1952, in an amount sufficient to make it subject to renegotiation under the provisions of section 105 (f) of the Renegotiation Act of 1951, as amended, and whether the unilateral order of the Renegotiation Board, dated November 6, 1956, was barred by the period of limitations set forth in the Renegotiation Act of 1951, as amended, because it was issued more than 2 years after the commencement of the renegotiation proceedings.

The parties have now stipulated that renegotiation proceedings for the year 1951 commenced on April 24, 1953, and that renegotiation was barred by the statute of limitations for the year 1951 after April 24, 1955. The parties have further stipulated that pursuant to stipulations of the parties the period within which a determination of the amount of profits, if any, for the year 1952, might be made pursuant to the Renegotiation Act of 1951, as amended, was extended to June 2, 1956, that the order of the New York Renegotiation Board entered on May 11, 1956, was within the time of such extension, and that the unilateral order of the Renegotiation Board dated November 6, 1956, was not barred by the period of limitations set forth in the Renegotiation Act of 1951, as amended.

Therefore, the sole question remaining for decision is whether petitioner had accruals from renegotiable contracts in the fiscal year ended December 31, 1952, in an amount sufficient to make it subject to renegotiation. This issue, in turn, depends upon whether the income from a contract which petitioner as a subcontractor entered into with the W. L. Cobb Construction Company which had a contract with the Corps of Engineers, United States Army, is properly includible in petitioner's income for 1951 or 1952 for the purposes of renegotiation.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation, incorporated under the laws of the State of Florida in 1927. During the years here involved and for a number of years prior thereto, it maintained its books of account on an accrual method of accounting and computed its income from construction contracts on the completed contract basis. Petitioner's Federal corporation income tax returns for 1951 and 1952 were filed on a calendar year basis and an accrual and completed contract basis of accounting.

On July 3, 1951, petitioner entered into a contract with the W. L. Cobb Construction Company (hereinafter referred to as Cobb) whereby it became a subcontractor under Contract No. DA–08–123–ENG–757, awarded to Cobb by the Corps of Engineers, United States Army, for work to be performed at the Pinecastle Air Force Base (now called McCoy Air Force Base), Orange County, Florida. This contract was identified on petitioner's books as Job No. 51 and is hereinafter so referred to. Contract No. DA–08–123–ENG–757 of the Cobb Construction Company was finally accepted by the Corps of Engineers on April 18, 1952.

On March 12, 1952, petitioner entered into an agreement with the Langston Construction Company (hereinafter referred to as Langston) whereby it undertook to do certain work as a subcontractor

under Contract No. DA–08–123–ENG–1051, awarded to Langston by the Corps of Engineers, United States Army. This contract was identified on petitioner's books as Job No. 52 and hereinafter is so referred to.

Job No. 51 and Job No. 52 were contracts subject to renegotiation and constituted petitioner's only renegotiable business for the years 1951 and 1952.

Petitioner's Job No. 51 was a unit price contract under which payment was made at a fixed rate per unit of work. It called for the performance by petitioner of unclassified and borrow excavation at a fixed price of 55 cents per cubic yard and the placement of 9,961 cubic yards of 2-inch muck blanket at a fixed price of $1.50 per cubic yard.

On or about April 29, 1952, petitioner filed with respondent a report on RB Form 1 with respect to its contracts subject to renegotiation for the year ended December 31, 1951, wherein it reported Job No. 51 as having been completed in the year 1951. In this report for the year 1951, petitioner stated that petitioner's accounting records were maintained on the completed contract basis of accounting.

On or about October 7, 1953, petitioner filed a revised report on RB Form 1 with the respondent for the year 1951 wherein it eliminated four prime contracts and two subcontracts which it stated had theretofore erroneously been reported as subject to renegotiation whereas in fact these contracts were exempt from renegotiation under Renegotiation Board Regulations 1453.5(b) (12). In this revised report petitioner reported Job No. 51 as its only contract subject to renegotiation which was completed in 1951 and reported income from Job No. 51 in the year 1951 in the amount of $620,896.39, which was the amount appearing in petitioner's ledger as accrued with respect to Job No. 51 as of December 31, 1951. The amount of $620,896.39 was also the amount reported by petitioner in its 1951 Federal corporation income tax return as income from Job No. 51.

On or about April 1, 1953, petitioner filed with respondent a consolidated report for the year 1952 on RB Form 1 and RB Form 1B with respect to three prime contracts and one subcontract, as well as a subcontract of a related partnership, F. W. Hooper and Company. Included in this report was $11,557.45 reported as work performed in 1952 applicable to Job No. 51 and $67,248.97 reported as applicable to Job No. 52. There was also reported 1952 costs applicable to Job No. 51 in the amount of $54,366.52. On September 17, 1953, respondent advised the F. W. Hooper and Company partnership that the subcontract contained in the consolidated report filed on or about April 1, 1953, was exempt from renegotiation under Renegotiation Board Regulations 1453.5(b) (12).

On or about November 3, 1953, petitioner filed with respondent an RB Form 1 for the year 1952 to replace the consolidated report previously filed. In submitting this report petitioner stated that its renegotiable business for the year consisted of $11,557.45 attributable to Job No. 51 and $67,248.97 attributable to Job No. 52.

On or about October 22, 1954, at the request of the New York Regional Renegotiation Board, petitioner filed a revised renegotiation report for its year ended December 31, 1952, wherein it included its total income from Job No. 51 in the amount of $632,453.84 and its total income from Job No. 52 in the amount of $67,248.97 as total 1952 sales subject to renegotiation. Petitioner, on page 1 of the revised RB Form 1 filed on October 22, 1954, made the following statement:

In filing this revised report reflecting Job No. 51 as having been completed in 1952, Hooper Construction Company is doing so at the request of The Renegotiation Board and without prejudice to its position that this job was properly reported as completed in 1951.

On petitioner's books it accrued the following direct costs and sales on Job No. 51 in the years 1951 and 1952:

|  | 1951 | 1952 |
|---|---|---|
| Sales | $620,896.39 | $11,557.45 |
| Direct costs | 325,894.22 | 54,366.52 |

On a cash basis, petitioner had receipts from Job No. 51 in the calendar year 1951 in the amount of $534,645.68 and in the calendar year 1952 in the amount of $88,696.87. Petitioner's direct costs of $54,366.52, accrued on its books in 1952 as applicable to Job No. 51, were expended for the following items:

| | |
|---|---|
| Repairs to equipment | $22,614.32 |
| Labor costs | 13,341.26 |
| Depreciation on equipment | 8,845.17 |
| Sundry costs | 7,577.96 |
| Small tools | 5,386.89 |
| Gas and oil | 897.38 |
| Other items | 631.98 |
| Telephone and telegraph | 93.75 |
| Freight and express | 15.45 |
| Credits: | |
| Reverse charge Euclid Memphis sales | (3,350.14) |
| Reverse charge Okee Const. Co | (687.50) |
| Total costs (Job No. 51 in 1952) | 54,366.52 |

Petitioner commenced operations under its subcontract about July 7, 1951, by clearing and grubbing the excavation area. On July 15, 1951, the unclassified excavation was started, and was completed about the end of October 1951. The borrow excavation was instituted on August 1, 1951, and was completed around mid-December 1951. The unclassified excavation (Clear Zone) was commenced in Septem-

ber 1951 and was completed about the first of December 1951. The last item of work begun by petitioner on Job No. 51 was the placement of the muck blanket to fertilize those areas designated by the Corps of Engineers prior to the sprigging and grassing of such areas. Another subcontractor of the Cobb Construction Company had the subcontract for sprigging and grassing.

Petitioner, upon completion of the borrow excavation around mid-December of 1951, commenced the mixing and placing of the muck blanket called for by its subcontract with Cobb. By December 19, 1951, petitioner had laid muck blanket over all excavated areas which under Cobb's contract were required to be covered with muck blanket.

As each item of work was completed by petitioner, it would be examined by both a representative of Cobb and the United States Corps of Engineers, and it would be determined that the performance of the work had been done in an acceptable manner before a further item of work which would overlay the work done by petitioner was permitted to be started. Prior to Christmas of 1951 Roy L. Warren, vice president of Cobb, in the presence of J. T. Barber, at that time assistant to the coordinator of Cobb's Pinecastle job, approved as satisfactory all of the work done by petitioner under its subcontract with Cobb and authorized the commencement of the sprigging operation.

On December 19 and 20, 1951, 36 of the 53 employees on petitioner's payroll for the week commencing December 16, 1951, were shown as paid off and discharged. Before the end of 1951 all of petitioner's machinery and equipment which had been used on Job No. 51 was, with the approval of the Chief of the Construction Division of the Corps of Engineers, moved to a storage area at the Pinecastle Air Force Base approximately one-half mile north of the construction area. Fifteen of petitioner's regular keymen remained at the Pinecastle Air Force Base after December 19, 1951, and were carried on petitioner's payroll as performing work on Job No. 51 until March 22, 1952.[1] During the time from December 20, 1951, through March 22, 1952, petitioner was engaged in repairing and repainting machinery which had previously been used in connection with the construction work on Job No. 51, which machinery at that time was located in the designated storage area at the Pincastle Air Force Base. Some of this repair work was done for petitioner by companies located in the general area of Orange County, Florida, and some of such work was done by petitioner's own employees.

During the performance of Job No. 51 petitioner received monthly statements from Cobb reflecting total aggregate credits and charges from July 5, 1951, to the end of the particular month involved. The

[1] Two of the 17 employees who remained on the payroll after December 20, 1951, were dropped during the first week in January 1952.

total credits reflected on such monthly statements were accrued in full on petitioner's books of account. The monthly statements received by petitioner from Cobb were based on monthly payment estimates approved by the area engineer and submitted to Cobb. Statement No. 6 submitted by Cobb to petitioner covered the period ending December 31, 1951. It was based upon payment estimate No. 6 approved by the area engineer and submitted to Cobb. Statement No. 6 reflected aggregate credits to petitioner for work performed prior to December 31, 1951, in the total amount of $620,896.39, composed of the following items:

| | |
|---|---:|
| Unclassified excavation | $230,531.40 |
| Borrow excavation | 319,468.60 |
| Unclassified excavation (Mod. #4) | 55,954.89 |
| 2-inch muck blanket | 14,941.50 |
| Total | 620,896.39 |

The quantity of muck blanket laid to date shown in this statement was 9,961 cubic yards.

Payment estimate No. 7, submitted by the area engineer to Cobb, covering the period January 31, 1952, showed the same total amount of work done by petitioner as reflected in payment estimate No. 6 for the period ended December 31, 1951, as heretofore set forth.

Payment estimate No. 8, submitted for the period ended February 29, 1952, contained the same amounts with respect to all items except 2-inch muck blanket and for this item showed total quantity to date of 10,052 cubic yards and the dollar amount of $15,078.52.

By letter dated April 25, 1952, petitioner was informed by W. L. Cobb Construction Company that in its final estimate No. 9, the following amounts had been approved for petitioner's work:

| | |
|---|---:|
| Unclassified excavation | $298,531.70 |
| Borrow excavation | 257,295.12 |
| Unclassified excavation (Clear Zone) | 69,357.52 |
| 2-inch muck blanket | 15,078.00 |
| Total | 640,262.34 |

This amount was adjusted to $632,284.80 in the final statement of August 22, 1952. In this final statement the amount and price for muck blanket remained unchanged.

In the payment estimate for the period ended Februray 29, 1952, submitted to the district engineer by the area engineer in charge of construction at Pinecastle Air Force Base, there was shown as item No. 11, 91 cubic yards of 2-inch muck blanket as completed that period. In the similar report of the area engineer for the period ended January 31, 1952, item No. 11 was shown as 9,961 cubic yards of 2-inch muck blanket placed to date, the estimated quantity called for by the contract, and that the item was 100 percent complete.

In the latter part of 1951 and early part of 1952 there was considerable rain at the location of the construction of Pinecastle Air Force Base which caused washes around drainage inlets and outlets requiring a little minor work of dressing up which was begun sometime in the latter part of December and was not finished until sometime in January. This work was done by either the prime contractor, Cobb, or one of the 12 to 15 subcontractors working on the job, one of which was petitioner. After this dressing up work was done it was necessary that it be covered over with muck blanket. The Corps of Engineers' records show that petitioner was allowed $136 in payment for laying 91 yards of muck blanket in February 1952. The work of laying this 91 yards of muck blanket in 1952 was performed by petitioner or its employees.

Petitioner's work on Job No. 51 had been substantially completed and accepted in the calendar year 1951 and under the method of accounting regularly used by the petitioner, income and expenses from this contract are properly includible in the year 1951.

OPINION.

Under the provisions of section 105(f) of the Renegotiation Act of 1951, as amended,[2] if the aggregate of the amounts received or accrued during the fiscal year by a contractor or subcontractor under renegotiable contracts is not more than $250,000 in the course of a fiscal year ending before January 30, 1953, such receipts or accruals are not subject to renegotiation. The parties are agreed that the proper accruals from petitioner's Job No. 52, which was the only work it did in either 1951 or 1952 on a contract subject to renegotiation other than its work on Job No. 51, were $67,248.97. Therefore, if there is not properly includible in petitioner's 1952 income at least the amount of $182,851.03 of accruals applicable to Job No. 51, petitioner is not subject to renegotiation in the year 1952.

The petitioner filed its Federal corporation income tax returns for the years 1951 and 1952 on an accrual and completed contract basis, and this was the basis on which it maintained its regular books of account. Section 103 of the Renegotiation Act of 1951, as amended,

---

[2] Sec. 105(f) of the Renegotiation Act of 1951, as amended, 50 U.S.C. App. sec. 1215 (p. 660–661):

(f)(1) *Aggregate amounts received or accrued during fiscal year.* If the aggregate of the amounts received or accrued during a fiscal year (and on or after the applicable effective date specified in section 102(a)) by a contractor or subcontractor, and all persons under control of or controlling or under common control with the contractor or subcontractor, under contracts with the Departments and subcontracts described in section 103 (g) (1) and (2), is not more than $250,000, the receipts or accruals from such contracts and subcontracts shall not, for such fiscal year, be renegotiated under this title. If the aggregate of such amounts received or accrued during the fiscal year under such contracts and subcontracts is more than $250,000, no determination of excessive profits to be eliminated for such year with respect to such contracts and subcontracts shall be in an amount greater than the amount by which such aggregate exceeds $250,000.

provides that "received or accrued" and "paid or incurred" as used in that Act shall be construed according to the method of accounting employed by the contractor or subcontractor in keeping his records, but if no such method of accounting had been employed or if the method so employed does not, in the opinion of the Board, or, upon redetermination, in the opinion of the Tax Court, properly reflect his receipts or accruals or payments or obligations, such receipts or accruals or such payments or obligations shall be determined in accordance with such method as in the opinion of the Board or the Court does properly reflect such items.[3]

The regulations of the Renegotiation Board (sec. 1459.1) provide that in connection with renegotiation on an overall fiscal year basis, income received or accrued and costs paid or incurred, shall be considered as having been received or accrued or paid or incurred in the fiscal year to which such items are to be attributed in accordance with the method of accounting employed by the contractor in determining net income for Federal income tax purposes or in accordance with such other methods as the contractor and the Board may agree upon. It is clear that petitioner's method of accounting for Federal income tax purposes was an accrual and completed contract method. The crux of the question is, therefore, whether under that method of accounting, petitioner's Job No. 51 should be considered as completed in the year 1951 for the purpose of renegotiation.

Under the appropriate Treasury regulations,[4] income from long-term contracts may be reported for the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice to so treat such income. It has been recognized that though generally a long-term contract is one which requires a period in excess of a year for completion, where a taxpayer reports all contracts on the completed contract basis it may also include contracts which require a period of less than a year for completion if that taxpayer has over a period of years consistently reported income from both long-term and short-term contracts on a completed contract method. *L. A. Wells Construction Co.*, 46 B.T.A. 302 (1942), affirmed per curiam 134 F. 2d 623 (C.A. 6, 1943), certiorari denied 319 U.S.

---

[3] Sec. 103(i) of the Renegotiation Act of 1951, as amended, 50 U.S.C. App. sec. 1213 (p. 653) :

(i) The terms "received or accrued" and "paid or incurred" shall be construed according to the method of accounting employed by the contractor or subcontractor in keeping his records, but if no such method of accounting has been employed, or if the method so employed does not, in the opinion of the Board, or, upon redetermination, in the opinion of the Tax Court of the United States, properly reflect his receipts or accruals or payments or obligations, such receipts or accruals or such payments or obligations shall be determined in accordance with such method as in the opinion of the Board, or upon redetermination, in the opinion of The Tax Court of the United States, does properly reflect such receipts or accruals or such payments or obligations.

[4] Regs. 118, sec. 39.42–4, applicable to the year 1952 and Regs. 111, sec. 29.42–4, applicable to the year 1951.

771. In the instant case petitioner and respondent agree that an accrual method and completed contract basis is the method of accounting generally employed by the petitioner. It is respondent's contention that for renegotiation purposes petitioner's income is not properly reflected unless Job No. 51 is considered as completed in 1952. The basis for respondent's argument is twofold. Its primary argument is a legal one based on the Supreme Court decision in *Lichter* v. *United States*, 334 U.S. 742. The respondent contends that under the holding in the *Lichter* case, for·purposes of renegotiation, Congress considered a contract not to be completed until the final payment had been made thereon. He thus argues that for the purpose of renegotiation, petitioner's Job No. 51 was not completed in the year 1951 since under the undisputed facts petitioner received payments in the amount of $88,696.87 on this contract in the year 1952. We do not agree with respondent's interpretation of the *Lichter* case. In the *Lichter* case the Court had for decision the question of the constitutionality of the World War II Renegotiation Act and one of the questions to be decided was the constitutionality of that Act as applied to contracts entered into before the enactment of the Act but with respect to which payment was not received until after the enactment of the Act.

In the *Lichter* case one of the parties involved was a subcontractor of a prime contractor who had a contract with the Government to supply war goods. This subcontractor had entered into his contract with the prime contractor prior to the enactment of the Renegotiation Act. The particular section of the Renegotiation Act under consideration provided for renegotiation of such subcontract if at the time of the enactment of the Renegotiation Act the contract was uncompleted to the extent that final payment had not been made thereon. The Court, in upholding the constitutionality of this provision of the Act, made the following statement upon which respondent relies (p. 789) :

We uphold the right of the Government to recover excessive profits on each of the contracts before us. This right exists as to such excessive profits whether they arose from contracts made before or after the passage of the Act. A contract is equally a war contract in either event and, if uncompleted to the extent that the final payment has not yet been made, the recovery of excessive profits derived from it may be authorized as has been done here.

This decision of the Supreme Court did not purport to fix the year in which income from a contract was properly reportable for the purposes of renegotiation. It was merely upholding the right to renegotiate any contract involving war goods where the final payment had not been made at the date of the enactment of the Renegotiation Act.

Respondent's second argument is that Job No. 51 was not finally completed and accepted in 1951 and since it is more equitable to petitioner to renegotiate Job No. 51 in 1952 because in that year petitioner reported $54,366.52 of accrued expenses as against $11,557.45 of accrued income, its determination should be sustained as more properly reflecting petitioner's receipts and accruals than would renegotiation of this contract in 1951.

The only factual argument in this case as to the amount of work, if any, done by petitioner in the year 1952 is whether petitioner in that year did some small amount of repair work necessitated by washes and laid 91 cubic yards of muck blanket for which it was allowed $136. Except for some possible help on minor dressing-up work necessitated by heavy rains and the laying of 91 cubic yards of muck blanket, respondent does not contend that the $11,557.45 accrued in 1952 was applicable to work done by petitioner in that year. With the minor exception noted, the parties agree that this amount represented an adjustment in the allowance made to petitioner for work done in 1951. The accrual in 1952 of an amount applicable to work admittedly done in 1951 does not support an argument that the work on the contract was not completed and accepted in 1951. It appears from the itemized list of the expenses comprising the $54,366.52 charged as accrued on Job No. 51 in 1952 that many of the items might more properly have been charged to general expense. However, this fact is not persuasive that the work on Job No. 51 had not been completed and accepted in 1951.

The evidence is very unsatisfactory as to whether peitioner in 1952 did some minor cleanup work where damage had been caused by an unusual amount of rain and laid 91 cubic yards of muck blanket to cover this work. The witnesses who testified for petitioner were of the opinion that this work was not done by petitioner since the muck blanket as laid had been accepted by Cobb as satisfactory so as to permit another subcontractor to begin sprigging and petitioner's machinery had been moved to a storage area a half mile from the sight of the construction work. Respondent's witness was of the opinion that this work was done by petitioner, at least to the extent of the placing of the 91 cubic yards of muck blanket, since it was shown as having been performed by petitioner in February 1952 on the records of the Corps of Engineers. These witnesses were testifying, at a time which was over 8 years after the final acceptance by the Corps of Engineers of the entire work done on the Cobb contract, as to the performance of a minor item of work at a price of $136 out of a total price for the subcontract work of over $600,000. None of the witnesses had a clear and distinct recollection of when and by whom the 91 yards of muck blanket were laid without reference to

other events. In this state of the record we must determine against petitioner upon whom rests the burden of proof and find that after acceptance of its completed laying of the muck blanket by Cobb which was the final work required by its subcontract, petitioner did in 1952 lay 91 cubic yards of muck blanket which was required as repair work because of washes caused by unusually heavy rains. We do not, however, agree with respondent's contention that it follows from that fact that petitioner had not completed its contract with Cobb for the purposes of renegotiation in the year 1951.

We agree with respondent's argument that it is not bound by the method actually used by petitioner in reporting its income for Federal income tax purposes if such method is improper. However, it is the accounting method regularly and properly employed by petitioner for Federal income tax purposes which, under respondent's own regulations, is to be used for the purposes of renegotiation, absent an agreement to the contrary. Cf. *Rushlight* v. *United States*, 259 F. 2d. 658 (C.A. 9, 1958), certiorari denied 359 U.S. 952. We must, therefore, look to the income tax law as applied to the facts in the instant case to determine whether petitioner's contract had been finally completed and accepted in 1951 so as to require the inclusion in that year of the income resulting therefrom. Cf. *Rosner* v. *W.C.P.A.B.*, 17 T.C. 445, 458-459 (1951). The respondent has cited no authority in support of his argument to the contrary except *Lichter* v. *United States, supra*, which, for the reasons heretofore stated, we do not consider apposite.

Under the completed contract method the petitioner has no discretion as to when the income shall be reported. It must be reported when the contract is finally completed and accepted. *V. T. H. Bien*, 20 T.C. 49 (1953). Finally completed and accepted means when the contractor has substantially performed his contract even though some minor particulars such as remedying defects may yet remain to be done. *Ehret-Day Co.*, 2 T.C. 25 (1943) ; *Standard Paving Co.*, 13 T.C. 425 (1949), affd. 190 F. 2d 330 (C.A. 10, 1951), certiorari denied 342 U.S. 860; *A. D. Irwin*, 24 T.C. 722 (1955), affd. 238 F. 2d 874 (C.A. 3, 1956).

Respondent's last argument is that final acceptance of petitioner's contract means the acceptance by the Corps of Engineers of the complete work done by Cobb and all its subcontractors on Contract No. DA-08-123-ENG-757, which acceptance was not given until April 18, 1952. Regardless of whether under the terms of the subcontract between Cobb and petitioner, petitioner could have been required to do any further work after December 19, 1951, the fact remains that on December 19, Cobb did accept petitioner's work as 100 percent completed and this acceptance is sufficient to deem the con-

tract completed for income tax purposes. The mere fact that Cobb might have been able to require petitioner to do some incidental dressing and pointing up of the work area up until the date of final acceptance by the Corps of Engineers of all the work performed by Cobb and its subcontractors, we feel is not determinative. Once Cobb initially accepted petitioner's work on December 19, 1951, for further work thereon by other subcontractors, petitioner had for all practical purposes completed its contract. The mere fact that there might be some subsequent work of a minor nature yet to be done does not suffice to either require or allow a contractor to treat the contract other than as completed. Petitioner's contract was completed and accepted in 1951. Cf. *Ehret-Day Co., supra.*

*Decision will be entered for the petitioner.*